**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0143n.06

No. 11-6406

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Feb 08, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| MICHAEL ANTHONY DOWLEN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: MARTIN and ROGERS, Circuit Judges, and TARNOW, District Judge.[*]

ROGERS, Circuit Judge. A federal jury convicted Michael Dowlen of twenty-nine counts of bank fraud for kiting checks worth nearly two-million dollars. On appeal, Dowlen challenges his conviction and thirty-seven-month, within-Guidelines sentence. He argues that the evidence was not sufficient, that irrelevant and prejudicial testimony was admitted, that the jury instructions were improper, that the district court incorrectly calculated the losses he caused, that he should have

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

received a reduction for acceptance of responsibility, and that the district court should have granted his request for a downward departure. None of Dowlen's arguments warrants reversal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Michael Dowlen operated a real estate construction business in southeastern Tennessee for over thirty years. Dowlen borrowed most of his funds from Colony LP and used business checking accounts with Northwest Georgia Bank and Cornerstone Community Bank. Following the decline of the real estate market in 2008, Colony refused to allow Dowlen to make further draws and Dowlen experienced cash flow problems.

This was not the first time that Dowlen experienced cash flow problems. According to Dowlen, for years he had regularly written checks to his subcontractors before he received funds to back the checks. Northwest Georgia Bank covered any overdrafts and charged Dowlen "nonsufficient fund" fees amounting to $1000 to $1500 a month. Dowlen saw these fees as analogous to interest costs and says he treated his checking account as a line of credit. Dowlen says he always expected to cover the checks.

The Government put forth evidence showing that from July 2008 to September 2008, Dowlen cross-deposited fifty checks between his accounts at Northwest Georgia Bank and Cornerstone Community Bank. Dowlen deposited twenty-nine checks, totaling $1,910,500, from his Northwest Georgia account into his Cornerstone account. During the same time period, he deposited twenty-one checks, totaling $1,812,100, from his Cornerstone account into his Northwest Georgia account.

This suggests a classic check-kiting scheme.[1]  Dowlen maintains that he expected all of these checks to be covered by legitimate funds.

In late August 2008, Dowlen's loan officer at Cornerstone spoke with Dowlen about the bank's suspicion that Dowlen was kiting checks and instructed him that if he wanted to make deposits from his Northwest Georgia account into his Cornerstone account, he would need to use cashier's checks.  The loan officer said that Dowlen agreed.  However, Dowlen continued to write checks on his Northwest Georgia account and deposit the checks into his Cornerstone account.

---

[1]

> Check kiting is a systematic scheme to defraud, whereby nonsufficient checks are traded or cross deposited between two or more checking accounts in order to artificially inflate the bank account balances. This is accomplished by using the float time in the bank system. Once bank accounts are artificially inflated, checks that would normally be returned for nonsufficient funds are, in fact, paid or honored by the issuing banks.

*United States v. Abboud*, 438 F.3d 554, 563 n.1 (6th Cir. 2006).  As *Abboud* explained, check kiting can act as a substitute for a short-term loan.

> For example, if the defendant needed $100,000 today but would not have sufficient money for three days, he would write a check for $100,000 on Day 1 from an account with Bank A with insufficient funds.  If Bank A has a one day float time, then it would find insufficient funds on Day 2.  Before Bank A returned the check, the defendant would write a check for $100,000 on Day 2 from an account with Bank B with [insufficient] funds.  If Bank B has a one day float time, then it would find insufficient funds on Day 3.  Before Bank B returned the check, the defendant would write a check for $100,000 on Day 3 from the account at Bank A with insufficient funds.  Before Bank A returned the check on Day 4, the defendant would hopefully have received sufficient money and deposited this in the account at Bank A.

*Id.* at 590.

According to the Government, Dowlen was able to continue his behavior because on August 25, 2008, he deposited $250,000 in third-party funds into his Northwest Georgia account. These funds came from two couples, the Howards and the Shoemakers, for whom Dowlen was building houses. Although both couples had already made their down payments and were not obligated to give Dowlen more money before the closing, Dowlen was able to convince them to pay him before their houses were complete. The Howards gave $100,000, and the Shoemakers gave $150,000. These funds appear to have covered two of the Northwest Georgia checks Dowlen deposited into his Cornerstone account in late August (checks from August 25th and August 26th totaling $98,000). However, subsequent checks were written without sufficient funds.

A few weeks later, the loan officer at Cornerstone became aware of Dowlen's continued check kiting and decided to close Dowlen's account. After Cornerstone closed Dowlen's account on October 8, 2008 and Cornerstone and Northwest Georgia resolved all outstanding checks, Dowlen was left with a positive balance at Cornerstone of $56,000. However, Northwest Georgia was left with a $310,000 loss and said they would go to the police if Dowlen did not cover the loss. Dowlen covered the $310,000 by entering into a settlement agreement with Colony LP. Colony paid Northwest Georgia $310,000 in exchange for Dowlen's release of any extortion claims he may have had against Colony. Colony did not lend Dowlen further funds and Dowlen was forced to file for bankruptcy.

The superseding indictment charged Dowlen with two counts of interstate transportation of fraudulently obtained money, two counts of criminally derived monetary transactions, and twenty-

nine counts of bank fraud (corresponding to the twenty-nine Northwest Georgia checks that Dowlen deposited into his Cornerstone account). Following a two-day trial, the jury found Dowlen guilty of the bank-fraud charges and acquitted him of the other charges.

The district court sentenced Dowlen to a within-Guidelines term of thirty-seven months' imprisonment. The presentence report calculated the total amount of the loss at $560,000, summing the $310,000 loss to Northwest Georgia and the $250,000 loss to the Howards and Shoemakers. Dowlen challenged both alleged losses. He argued that because Northwest Georgia received the $310,000, it had not lost money, and that the losses to the Howards and Shoemakers were unrelated to the check-kiting scheme. The district court—relying upon Application Note 3(E) of U.S.S.G. § 2B1.1—determined that the $310,000 was an attributable loss because the repayment occurred after Northwest Georgia detected the scheme. The district court allowed for a reduction in the loss related to the Howards' and Shoemakers' funds to account for a portion of the funds that may have been used by Dowlen for legitimate business purposes. For Guidelines-calculation purposes, the court found only $100,000 of the losses to be attributable to Dowlen's check-kiting scheme. In total, the district court found the attributable losses to be $410,000. Because the offense level increases occur at $400,000 and $1,000,000, *see* U.S.S.G. § 2B1.1(b), the change from $560,000 to $410,000 had no effect on Dowlen's Guidelines range.

Dowlen also moved for a downward departure. Dowlen argued that he was an atypical white-collar defendant because he had been a law-abiding businessman for over thirty years and only got into trouble because Colony LP decided not to provide him with needed funds. The district court

rejected this motion because the court found that Dowlen was "not outside of the heartland of offenders" that the particular guideline was written for and that check kiting was "specifically the type of offense that the Sentencing Commission had in mind." Sentencing Hr'g Tr. 39, Nov. 3, 2011. Accordingly, the court did not find a downward departure to be appropriate.

Dowlen appeals his conviction and sentence.

## II. ANALYSIS

On appeal, Dowlen raises six challenges to his conviction and sentence. None warrants reversal.

### A. *Sufficiency of the Evidence*

Dowlen first argues that the Government failed to offer sufficient evidence showing he intended to defraud Cornerstone Community Bank. A rational jury could have found that when Dowlen continued to cross-deposit checks without sufficient funds after Cornerstone bank told him not to do so, sufficient circumstantial evidence of his fraudulent intent existed. A jury likely would have been able to find that the extent of Dowlen's actions before the warning from Cornerstone Community Bank was sufficient, but even if the court assumes that Dowlen's criminal intent was not clear before the warning, there is no explanation other than an intent to defraud for his actions after the warning.

When considering a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979).  There are three elements of bank fraud under 18 U.S.C. § 1344:  (1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution, (2) the defendant had an intent to defraud, and (3) the financial  institution was insured by the FDIC.  *See United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001).  Dowlen does not challenge the applicability of 18 U.S.C. § 1344 to his actions or to Cornerstone Community Bank.  He contends, however, that the Government did not put forth sufficient evidence for a rational jury to find that he intended to defraud Cornerstone.

"'Intent to defraud' means to act 'with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself.'"  *United States v. Vavlitis*, 9 F.3d 206, 212–13 (1st Cir. 1993) (quoting *United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989)).  As this court has recognized, "[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension."  *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (quoting *United States v. Yoon*, 128 F.3d 515, 523–24 (7th Cir. 1997) (modification in original)).

The combination of the number of checks exchanged by the banks, the large dollar value of the checks, and the absence of an apparent legitimate purpose for the transactions suggests Dowlen intended to defraud Cornerstone Community Bank.  *See United States v. Yoon*, 128 F.3d 515, 524 (7th Cir. 1997).  But even if we assume for purposes of argument that there are good-faith

explanations for these facts, there is no explanation for Dowlen's continued check kiting after

Cornerstone confronted him. *See United States v. Abboud*, 438 F.3d 554, 593–94 (6th Cir. 2006).

His continued check kiting and the simultaneous infusion of the Howards' and Shoemakers' funds

can only be understood as demonstrating Dowlen's intent to deceive Cornerstone for his own

financial benefit. For purposes of establishing guilt under 18 U.S.C. § 1344, it is not required that

Cornerstone suffered any loss. *See Everett*, 270 F.3d at 991. There was sufficient evidence to

support the jury's conviction.

B. *Admissibility of the Testimony of David Howard and Peggy Shoemaker*

Second, Dowlen argues that the district court abused its discretion by finding the testimony

of David Howard and Peggy Shoemaker relevant and not unduly prejudicial. The admission of

David Howard's and Peggy Shoemaker's testimony does not warrant reversal.

The Government introduced the testimony of David Howard and Peggy Shoemaker, two

individuals who were buying homes that Dowlen was constructing. Although the Howards and

Shoemakers already paid their down payments, Dowlen was able to convince them to give him

$250,000 in additional funds in late August 2008. Based on the testimony of an expert in check

kiting, the Government alleged that Dowlen sought this $250,000 to perpetuate his check-kiting

scheme. The Government put Mr. Howard and Mrs. Shoemaker on the stand to provide background

evidence regarding the source of the $250,000 and Dowlen's business dealings.

Dowlen objected, arguing that Mr. Howard's and Mrs. Shoemaker's testimony was irrelevant

and unduly prejudicial. Dowlen argues here on appeal that the Government's purpose was to inject

evidence of Dowlen's breach of contract with the Howards and Shoemakers to bias the jury against Dowlen. He argues that their testimony is irrelevant to the check-kiting scheme because there was no nexus between the homes he was building for the Howards and Shoemakers and the check kiting.

The district court did not abuse its discretion in finding the evidence relevant. Relevancy is a low bar; all that is required is for the evidence to have "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401. At trial, the Government represented that the testimony would show Dowlen's knowledge that his check-kiting scheme was falling apart and that he had a guilty intent in "swindling these folks." Trial Tr. July 18, 2011, 146. The district court did not abuse its discretion in finding that Mr. Howard's and Mrs. Shoemaker's testimony would have some tendency to make Dowlen's intent to defraud the banks more probable than it would be without the evidence.

Dowlen had a plausible argument that even if the evidence was relevant, its prejudicial nature outweighed its probative value. However, this determination is within the broad discretion of the trial judge and this court considers "the evidence in 'the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (quoting *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984)). The testimony of Mr. Howard and Mrs. Shoemaker had the potential to inform the jury about Dowlen's behavior after Cornerstone bank confronted him about his check-kiting scheme. This could be probative of Dowlen's intent to defraud the bank. The danger of unfair prejudice could be as minimal as the time it took for two witnesses to speak. In fact, this is how the district court

understood the prejudice. *See* Trial Tr. July 19, 2011, 165 ("The only prejudice I could see to your client is that we may have to hear from two other witnesses.").

Mrs. Shoemaker's statement from the stand, "That was our life savings and it's been stolen," *id.* at 189, confirmed Dowlen's concerns of unfair prejudice, but as the Supreme Court stated in *Old Chief v. United States*, "[i]t is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight." 519 U.S. 172, 182 n.6 (1997). Perhaps the district court should have predicted Mrs. Shoemaker's statement, but this type of prediction is the province of the trial judge. It was not an abuse of discretion to allow Mr. Howard and Mrs. Shoemaker to testify.

### C. *Jury Instruction*s

Third, Dowlen argues that it was error for the district court to instruct the jury that it was irrelevant whether the financial institution was paid back. Looking at the jury instructions as a whole, the instructions do not require reversal.

The district court instructed the jury as follows:

> It is sufficient to prove an intent to defraud if the government proves the funds of the financial institution were at risk. Note the language is "at risk," not that the bank lost money or that the defendant intended to cause the financial institution to lose money. Neither an actual loss of money [n]or an intent on the part of the defendant for the financial institution to lose money is required under the bank fraud statute. *For that reason it is also irrelevant whether the financial institution was paid back, was reimbursed, or did not lose money.* It is also irrelevant for your consideration whether checks were covered or made good, whether insufficient funds fees or penalties were paid, or if a financial institution honored the checks.
>
> Bank fraud is a federal offense. So whether a bank participated in, acquiesced in, or approved the fraud would not be a defense. For a person to have the intent to

defraud, they cannot act in good faith. A person who acts or causes another person to act on a belief or an opinion honestly held is not punishable under the bank fraud statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct. A defendant does not act in good faith if, even though he honestly holds a certain opinion or belief, that defendant also knowingly makes false or fraudulent pretenses, representations, or promises to others or acts with reckless disregard for the true facts.

While the term good faith has no precise definition, it encompasses, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another. The burden of proving good faith does not rest with the defendant, because the defendant does not have any obligation to prove anything in this case. It is the government's burden to prove to you beyond a reasonable doubt that the defendant acted with an intent to defraud. If the evidence in this case leaves you with a reasonable doubt as to whether the defendant acted with an intent to defraud or instead acted in good faith, you must find the defendant not guilty on that particular count of fraud.

Trial Tr. July 20, 2011, 347–49 (emphasis added). Dowlen acknowledges that his postdetection repayment does not reduce his culpability. Dowlen contends, however, that the jury could consider his repayment relevant to whether he initially intended to defraud the banks.

Dowlen is logically correct that evidence of repayment could be relevant to Dowlen's predetection intent because repayment makes it more probable that it was an honest mistake than if Dowlen had refused to reimburse Northwest Georgia for its loss. But the question for this court is whether "the instructions, when viewed as a whole, were confusing, misleading, and prejudicial." *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 787 (6th Cir. 2003) (quoting *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000). The statement about relevance was made in the course of instructing the jury concerning the issue of whether a bank needs to suffer a loss. The district court subsequently gave detailed instructions covering the good-faith defense. The jury was

told "An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct . . . . While the term good faith has no precise definition, it encompasses, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another." Trial Tr. July 20, 2011, 348. As a whole, the instructions were acceptable because a jury would have understood that it could take all facts into account when considering whether Dowlen acted in good faith when he initially presented the checks to Cornerstone.

In addition, the record reflects that the district court was open to the idea of substituting another word for the word irrelevant, to address Dowlen's concerns. *See id.* at 330 ("I would be willing to consider replacing the word <u>irrelevant</u> with something else."). The district court also considered other ways to express its point about repayment but decided that concerns about biasing the jury outweighed more specific language. The district court said

> I considered putting in, "It is not a defense whether the financial institution was paid back," but thought that was a little bit too much involved in this case. So I was trying to tell the jury that "It's really not a consideration for you whether the bank was paid back or not paid back, or whether the checks were covered or not covered."

*Id.* at 331.

Dowlen's argument regarding the district court's instructions does not warrant reversal.

### D. *Attributable Loss*

Fourth, Dowlen contends that the district court incorrectly calculated the attributable loss under U.S.S.G. § 2B1.1. Dowlen makes a two-part argument, but both parts fail.

### 1. Northwest Georgia's $310,000 Loss

Dowlen argues that because he was not charged in the superseding indictment with defrauding Northwest Georgia Bank and because he paid Northwest Georgia back for its $310,000 loss, the district court's inclusion of Northwest Georgia's $310,000 loss was an error. This argument is not meritorious.

First, Dowlen's postdetection repayment is not material to the attributable loss calculation. The Guidelines commentary allows for a reduction in attributable loss for predetection repayment. *See* U.S.S.G. § 2B1.1 cmt. n.3(E)(I). The key moment, however, is detection. *See Abboud*, 438 F.3d at 594. If postdetection repayments reduced the attributable loss, then wealthy defendants would simply be able to buy their way out of jail. *See United States v. Flowers*, 55 F.3d 218, 221 (6th Cir. 1995). Because Dowlen's repayment was made after detection, repayment does not change the calculation of attributable loss under U.S.S.G. § 2B1.1.

Second, whether he was charged with defrauding Northwest Georgia Bank is also not material to the attributable loss calculation. Attributable losses are calculated by looking at all acts and omissions "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . [and] *all harm that resulted from the acts and omissions*." U.S.S.G. § 1B1.3(a) (emphasis added). Whether or not the Government charged Dowlen with defrauding Northwest Georgia bank, the $310,000 loss resulted from acts occurring during the commission of Dowlen's fraud upon Cornerstone.

Northwest Georgia's $310,000 loss was properly attributed to Dowlen's check-kiting scheme.

### 2. The $100,000 Loss Related to the Howards and Shoemakers

Dowlen's argument that the Howards' and Shoemakers' losses should not have been taken into account also does not require reversal. At the sentencing hearing, Dowlen and the Government offered differing theories regarding whether the Howards' and Shoemakers' losses resulted from Dowlen's check-kiting scheme. The Government contended that the Howards' and Shoemakers' losses resulted from Dowlen's acts that took place "in the course of attempting to avoid detection or responsibility," U.S.S.G. § 1B1.3(a)(1), for his bank fraud, and are therefore attributable losses. In support of this theory, the Government pointed out that the injection of the Howards' and Shoemakers' funds into the check-kiting scheme shifted losses from Northwest Georgia Bank to the families. Dowlen maintained that he obtained the $250,000 from the Howards and Shoemakers in the ordinary course of his construction business and that their losses resulted from the overall failure of his business rather than anything related to the check-kiting scheme.

The district court appeared to split the difference, but effectively sided with the Government. The district court said that it was giving Dowlen the benefit of the doubt and credited Dowlen with $150,000 as being used for legitimate business purposes, but the court found the remaining $100,000 to be an attributable loss. When combined with Northwest Georgia's $310,000 loss, this resulted in a loss of $410,000—above the $400,000 threshold for U.S.S.G. § 2B1.1(b)(1) offense-level determination. Because the next loss tier was at $1,000,000, the only question for Guidelines calculation purposes was whether the attributable losses would be more than $400,000. As long as

- 14 -

the district court found that at least $90,001 of the Howards and Shoemakers' funds went into the check-kiting scheme, the Guidelines range would be the same.

The court's allocation of the $250,000 between legitimate business purposes and the check-kiting scheme is a factual determination and thus is reviewed for clear error. *See* 18 U.S.C. § 3742(e). The amount of loss does not need to be precisely calculated; the Guidelines say that the "court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). Accordingly, the question for this court is whether it "is left with a definite and firm conviction" that the district court made an unreasonable estimate. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

The district court's allocation was not clear error. The district court was presented with two plausible theories of how to treat the $250,000 and chose a reasonable estimate that was in-between and resulted in a sentence that was consistent with the Government's theory. As the Supreme Court stated in *Anderson*, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. It would be more satisfying on review if the district court had been able to trace where the $250,000 went, but a district court does not need to determine loss amounts with precision. *See United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006). The district court said its allocation was "very conservative" and gave Dowlen the benefit of the doubt. Sentencing Hr'g Tr. 30, Nov. 3, 2011. The district court's estimate was reasonable, especially considering that the only two checks with sufficient funds were written around the same time as Dowlen's receipt of the Howards' and Shoemakers' money and these two checks had a

combined value of $98,000. This consideration makes it very reasonable for a factfinder to conclude that at least $90,001 of the Howards and Shoemakers' funds went into the scheme. The district court's estimate was not clear error.

### E. *Reduction for Acceptance of Responsibility*

Fifth, Dowlen argues that he should receive a two-level reduction for acceptance of responsibility because he repaid Northwest Georgia Bank. Dowlen did not make this argument below and failed to object to the presentence report's recommendation that he should not receive an adjustment for acceptance of responsibility. Therefore, our review is limited to plain error. That is, Dowlen must show an error that was obvious or clear, affected his substantial rights, and affected the fairness, integrity, or public reputation of the judicial proceeding. *See United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc).

The Guidelines allow for a reduction only when the defendant "*clearly* demonstrates acceptance of responsibility." U.S.S.G. § 3E1.1 (emphasis added). Thus, for it to be an obvious or clear error not to apply the acceptance-of-responsibility reduction, it must be doubly clear.

If this standard of review does not dictate the outcome in Dowlen's case, the Guidelines commentary does. The commentary states that:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. . . . In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

U.S.S.G. § 3E1.1 cmt. n.2. In this case, Dowlen had not admitted guilt or expressed remorse even after being found guilty; in fact, he maintains that there is an insufficient factual basis to convict him. In addition, Dowlen does not challenge the constitutionality or applicability of 18 U.S.C. § 1344. The acceptance-of-responsibility reduction is not intended to apply to someone in Dowlen's position.

Dowlen argues that *United States v. Flowers*, 55 F.3d 218, 221–22 (6th Cir. 1995), requires that defendants who make postdetection payments should receive a two-point reduction for acceptance of responsibility. We did state in *Flowers* that "[t]he fact that a check kiter enters into a repayment scheme after the loss has been discovered does not change the fact of the loss; such fact merely indicates some acceptance of responsibility." 55 F.3d at 221–22 (quoting *United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1995)). But this statement was made in the context of the calculation of losses for U.S.S.G. § 2B1.1, rather than the application of the acceptance-of-responsibility reduction at § 3E1.1. In *Flowers*, the district court approved of a two-point reduction for acceptance of responsibility after Flowers pled guilty, *see* 55 F.3d at 220, 222, so this court had no occasion to consider the application of § 3E1.1. The opinion in *Flowers* could have just as easily used the phrase "acceptance of the consequences" rather than "acceptance of responsibility" and come to the same conclusion without any confusion about the application of U.S.S.G. § 3E1.1.

While Dowlen's repayment may show that he is accepting the consequences of his actions, he has not accepted full responsibility for his actions. Responsibility entails a recognition of moral accountability. Dowlen, on the other hand, maintains that his actions were harmless and continues to pin the blame on Colony LP. Dowlen has not demonstrated that plain error occurred.

F. *Downward Departure*

Sixth, Dowlen argues that the court erred in rejecting his motion for a downward departure. This court's jurisdiction to review a district court's decision not to depart downward is extremely circumscribed; a decision not to depart downward cannot be reviewed "unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Puckett*, 422 F.3d 340, 344–45 (6th Cir. 2005) (quoting *United States v. Stewart*, 306 F.3d 295, 329 (6th Cir. 2002)); *see also* 18 U.S.C. § 3742. The transcript of the sentencing hearing shows a lengthy colloquy regarding Dowlen's argument for a downward departure. *See* Sentencing Hr'g Tr. 31–42, Nov. 3, 2011. At no point did the court express any doubt that it could make such a departure, and the lengthy nature of the colloquy suggests that the court understood that it could grant the motion for a downward departure if it found it warranted. Dowlen has not overcome the presumption that a district court is aware of and understands its discretion to depart downward. *See United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). Therefore, this court does not have jurisdiction to review the district court's decision not to depart downward.

III. CONCLUSION

For the foregoing reasons, Dowlen's conviction and sentence are affirmed.