RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GEORGE ERNEST SKOUTERIS, JR.,

*Defendant-Appellant.*

No. 21-6221

─────────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:18-cr-20254-1—John Thomas Fowlkes Jr., District Judge.

Decided and Filed:  October 19, 2022

Before:  McKEAGUE, THAPAR, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Josie S. Holland, HOLLAND LAW, Memphis, Tennessee, for Appellant.  Carroll L. Andre III, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

─────────────────

## OPINION

─────────────────

CHAD A. READLER, Circuit Judge.  George E. Skouteris Jr. is a former college football player.  Following his playing days, Skouteris moved from the stadium to the courtroom, practicing as a personal injury lawyer.  His client service, however, was more in the form of a turnover than a touchdown.  Case in point, he routinely settled cases without client permission, forged client signatures on settlement checks, and then deposited those checks into his own account.  Complaints from angry clients mounted, as did interest by state and federal authorities.

At his jury trial for federal bank fraud, Skouteris argued that his days on the gridiron had left him with mental impairments—including possible chronic traumatic encephalopathy (CTE)—that cast doubt on whether he had the requisite state of mind to commit bank fraud. The jury disagreed and found Skouteris guilty of the charged offense. He was sentenced to 30 months' imprisonment and ordered to pay nearly $150,000 in restitution. On appeal, Skouteris argues that his football injuries warrant a replay of his jury trial or, in the alternative, his sentencing. We disagree and therefore affirm.

**I.**

Memphis attorney George E. Skouteris Jr. practiced plaintiff-side, personal injury law for clients injured in automobile accidents. One of those clients was Tiffany Williams. She sought Skouteris's services in the aftermath of a car accident that killed her fiancé and put Williams in the hospital. Skouteris agreed to take on the representation. But from that point on, Williams struggled to get updates from Skouteris about her case. Eventually, she learned that Skouteris had settled the case (for $197,480) without her knowledge. Worse yet, Williams discovered that Skouteris had signed her name to the settlement check and deposited the proceeds into his account at Trust One Bank. With mounting medical bills and other life expenses, Williams pressed Skouteris for the money. But Skouteris gave her only "bits and pieces" of the settlement while assuring her that he was working with lienholders to resolve her pending bills.

After nearly two years of getting the runaround, Williams hired another attorney to recover the remaining settlement money. Her new attorney soon discovered that Skouteris had used Williams's settlement money for other things. The experience distressed Williams emotionally and financially.

Williams's experience with Skouteris, regrettably, was not unique. Skouteris continued his practice of unauthorized settling, forging, and then depositing those monies in his Trust One Bank accounts, at the expense of other clients, too. Some, like Williams, were lucky enough to receive from Skouteris a small piece of the settlement years after the fact. Others never saw any of the settlement proceeds from Skouteris.

Unsurprisingly, Skouteris's clients were not happy. A few filed complaints with Tennessee attorney disciplinary authorities. Another contacted the Shelby County District Attorney's office. Eventually, local authorities arrested Skouteris on state stolen property charges. He was also disbarred. And a federal grand jury indicted him for seven counts of bank fraud. The indictment covered activity from 2007 until 2013, but it did not specifically reference Skouteris's representation of Williams.

The central issue at Skouteris's federal trial was whether he had the requisite intent to commit bank fraud. Jurors heard from a parade of Skouteris's former clients. One was Williams, whose testimony was limited to proving Skouteris's intent under Federal Rule of Evidence 404(b)(2). Another was Justin Levick, who testified under the same limitation. Family, friends, and colleagues of Skouteris also took the stand to address Skouteris's mental capacity. Much of that lay testimony suggested that Skouteris was not acting under any sort of diminished cognitive capacity during the relevant time. For example, one colleague told the jury that she "never witnessed" any sign of mental impairment and remarked how "impressed" she was with Skouteris's ability to recall the details of a particular client's case.

The jury also heard from two psychologists who examined Skouteris—a defense expert and a government expert. The defense expert maintained that Skouteris suffered from a "major depressive disorder," "alcohol use disorder," and "seizure disorder," the latter of which began to manifest during Skouteris's football career. The expert concluded that these disorders, taken together, would have "significantly limited" Skouteris's "ability to organize his mental efforts during the" period of the alleged offenses, producing the "errors" in his handling of client settlements. The government's expert agreed that Skouteris suffered from depression and alcohol use disorder but concluded that Skouteris was "capable of having the mental ability to form and carry out complex thoughts, schemes, and plans."

At the charging conference, the parties largely agreed on the scope of the jury instructions, including how to explain the state of mind Skouteris needed to be found guilty. The parties also agreed to include an instruction explaining the limited purpose of the FRE 404(b) testimony. Skouteris's attorney, however, sought an additional instruction explaining that

evidence of "diminished mental capacity" could provide "reasonable doubt that" Skouteris had the "requisite culpable state of mind." The district court declined to include the instruction.

The jury returned guilty verdicts on all seven counts. At sentencing, the district court determined Skouteris's sentencing range was 46 to 57 months. As Skouteris's criminal history was minimal, the nature of Skouteris's offenses largely drove the calculated range. Skouteris's offense level was a product of his base score, coupled with enhancements for: (1) "losses," *see* U.S.S.G. § 2B1.1(b)(1)(G); (2) abusing a position of trust or using a special skill, *see* U.S.S.G. § 3B1.3; and (3) committing an offense that resulted in "substantial financial hardship" to at least one victim, *see* U.S.S.G. § 2B1.1(b)(2)(A)(iii). The genesis of the last enhancement was Williams's losses. From this Guidelines range, the district court considered whether there should be a departure for diminished capacity or a downward variance. After hearing from the government, the defense, and several witnesses, the district court varied downward for a sentence of 30 months' imprisonment followed by three years of supervised release.

Skouteris's conviction also required him to make restitution to the victims of his offenses. *See* 18 U.S.C. § 3663A(a). That aspect of the sentencing proceedings proved more difficult to resolve. For months, the parties debated both the amount of restitution and to whom it was owed. Ultimately, the parties were unable to agree whether the restitution owed to Williams should be reduced for attorney's fees. The district court declined to reduce the restitution amount owed to Williams. Skouteris was ordered to pay $147,406. Of that, $77,882 was owed to Williams. Skouteris's timely appeal followed.

## II.

**A.** Skouteris first takes aim at the sufficiency of the evidence supporting his conviction under 18 U.S.C. § 1344(1). While the indictment and jury instructions seem to mix elements of § 1344(1) (defrauding a financial institution) and § 1344(2) (obtaining monies held by a financial institution by false pretenses), we focus, as the government did here, on § 1344(1). *Cf. United States v. Hall*, 979 F.3d 1107, 1116 (6th Cir. 2020) ("[W]e are not concerned that the jury convicted [the defendant] for anything besides violating § 1344(1)" when the government elects to rely on § 1344(1) and the jury instructions "overlap substantially."). (By not raising the issue

on appeal, Skouteris has forfeited any argument that the indictment, by including both 18 U.S.C. § 1344(1) and (2) in each count, was duplicitous in violation of Federal Rule of Criminal Procedure 12(b)(3)(B). *See United States v. White*, 920 F.3d 1109, 1114 (6th Cir. 2019)). Successfully challenging a jury verdict is no easy feat. We view the evidence in the light most favorable to the government and affirm if any rational juror could have found Skouteris guilty of federal bank fraud. *United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021). Accordingly, we will overturn the verdict only where the jury "behaved irrationally in concluding beyond a reasonable doubt that" Skouteris "knowingly execute[d], or attempt[ed] to execute, a scheme or artifice . . . to defraud a financial institution." *See United States v. Miller*, 982 F.3d 412, 440 (6th Cir. 2020); 18 U.S.C. § 1344(1).

Although we ultimately opt to frame § 1344(1) under a more precise formula, *see infra* at 10, we begin by noting our longstanding view that § 1344(1) violations consist of three distinct elements: that a defendant (1) knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) did so with the intent to defraud; and (3) the financial institution was federally insured. *See Hall*, 979 F.3d at 1117; *United States v. Parkes*, 668 F.3d 295, 301 (6th Cir. 2012); *United States v. Warshak*, 631 F.3d 266, 312 (6th Cir. 2010); *United States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007); *United States v. Abboud*, 438 F.3d 554, 590 (6th Cir. 2006); *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005); *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001); *United States v. Hoglund*, 178 F.3d 410, 412–13 (6th Cir. 1999). As the jury heard evidence that Trust One Bank, where Skouteris deposited the misappropriated client funds, was FDIC insured, no one disputes the third element (the jurisdictional hook). That leaves the other two elements at issue.

**1.** The government need not demonstrate proof of actual loss by a bank to satisfy § 1344's "scheme to defraud" element. *See Hoglund*, 178 F.3d at 413; *see also Shaw v. United States*, 580 U.S. 63, 67 (2016). Rather, that aspect of the crime is satisfied when a defendant engages in deception to deprive a financial institution of its right to use its property, including customer deposit funds that it controls. *See Shaw*, 580 U.S at 66–67.

The jury heard ample evidence that Skouteris engaged in such conduct. Testimony from more than a half dozen witnesses as well as voluminous physical evidence painted a clear picture

of Skouteris's legal practice.  Without client awareness or approval, Skouteris regularly affixed his client's signature on the client's settlement check, resulting in Trust One Bank depositing the check's proceeds into Skouteris's own account.  In so doing, the bank was wrongfully "'deprived of its right' to use" those funds, satisfying § 1344(1)'s "scheme to defraud" requirement.  *Shaw*, 580 U.S. at 67 (quoting *Carpenter v. United States*, 484 U.S. 19, 26–27 (1987)).  As our sister circuits agree, a bank, by accepting a forged check, necessarily distributes its funds to an unauthorized party, preventing the bank from otherwise using those funds while risking liability for the bank itself.  *See United States v. Lemons*, 941 F.2d 309, 316 (5th Cir. 1991); *see also United States v. Brandon*, 298 F.3d 307, 312 (4th Cir. 2002) (holding that presenting forged instruments to merchants who exchanged goods for the funds held by the drawee bank satisfies § 1344's scheme to defraud element); *United States v. Laljie*, 184 F.3d 180, 189 (2d Cir. 1999) (similar); *cf. Everett*, 270 F.3d at 991 ("Thus, even if the Appellant did not intend to defraud the bank, causing a bank to transfer funds pursuant to a fraudulent scheme reduces the funds the bank has available for its loans and other activities and almost inevitably causes it some loss.").

Skouteris pushes back.  He claims he had either actual or apparent authority to cash the checks.  Yet he concedes that his argument is irrelevant as to virtually all of the clients named in the indictment. And even then, his argument has no legs.  For starters, Skouteris identifies no evidence suggesting that the remaining clients expressly authorized him to settle any pending claims they had, let alone cash any resulting settlement check.  Instead, the jury heard evidence that each client learned of the settlement well after it occurred, contrary to Tennessee law, which requires an attorney to receive express authorization from his client detailing settlement specifics before surrendering his client's rights.  *See, e.g.*, *Borena v. Yellow Cab Metro, Inc.*, 342 S.W.3d 506, 509–10 (Tenn. Ct. App. 2010).  Skouteris's apparent authority argument is equally flawed. Apparent authority is established by the "acts of the principal." *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432–33 (Tenn. 2008).  Yet Skouteris points to no evidence showing that his clients clothed him "with the appearance of authority" to cash an unknown settlement check.  *Id.* at 433 (quoting *S. Ry. Co. v. Pickle*, 197 S.W. 675, 677 (Tenn. 1917)).

With Skouteris lacking any authority (actual or apparent) to settle his clients' claims, it is difficult to believe he was authorized to endorse his client's name on a settlement check the

client never knew existed. In fact, after cashing a client's settlement check, Skouteris either ignored the client's calls or falsely claimed that he was still working on a settlement, hardly the conduct of one fully clothed with the authority to endorse a settlement check on the client's behalf.

Skouteris has one last theory. He argues that at least one of his clients ratified his endorsement of her settlement check by accepting partial proceeds of the settlement after the fact. Ratification may redeem the underlying transaction—in this case, the settlement reached by Skouteris. But it does not "relieve" Skouteris of "criminal liability" for falsifying endorsements on the settlement checks and depositing the proceeds into his bank accounts. *See* Tenn. Code Ann. § 47-3-403 cmt. 3. In other words, ratification could perhaps be a viable defense by the settling tortfeasor sued by one of Skouteris's former clients. But it is of no help to Skouteris. All said, the evidence presented to the jury showed that Skouteris was engaging in a deceptive scheme (i.e., forgery) when he cashed the settlement checks, satisfying § 1344's "scheme to defraud" element.

**2(a).** That leaves the "intent to defraud" element. And it leads us to ask what must the government show to satisfy the "intent" aspect of the crime? The answer is not straightforward. "Intent" as used in the criminal law setting has "always been [a] rather obscure" concept. Wayne R. LaFave, 1 Subst. Crim. L. § 5.2 (3d ed. 2021). Traditionally, "intent" encompassed "knowledge." *Id.* So a defendant's knowledge of the "practical certainty of the results" of his actions satisfied the "intent" state of mind requirement. *Id.* § 5.2(b). The more "modern approach," however, has been to distinguish between the mental states of "intent" and "knowledge"—with the former being satisfied when a defendant acts "purposely" consistent with his conscious objective to "cause such a result." *Id.* (quoting Model Penal Code § 2.02(2)(a)(i)). It is not entirely clear whether our reference in prior bank fraud cases to the "intent to defraud" element suggests the traditional or modern view of "intent." At times, we have described § 1344(1) as requiring that a defendant "knowingly intended to defraud a bank." *Ross*, 502 F.3d at 530; *see also United States v. Woods*, 877 F.2d 477, 480 (6th Cir. 1989) (describing the state of mind requirement under 18 U.S.C. § 656 as the "same" as bank fraud, requiring the defendant act "knowingly or with reckless disregard"). More often, we have

equated "intent to defraud" with having the "purpose of causing a financial loss to another or bringing about a financial gain to oneself." *See United States v. Kerley*, 784 F.3d 327, 343 (6th Cir. 2015) (quoting *United States v. Olds*, 309 F. App'x 967, 972 (6th Cir. 2009)); *see also United States v. Benchick*, 725 F. App'x 361, 365 (6th Cir. 2018); *United States v. Dowlen*, 514 F. App'x 559, 563 (6th Cir. 2013).

This latter view—that § 1344(1) imposes a "purposeful" state of mind requirement—is a curious one in view of the statute's text. Recall that § 1344(1)'s relatively terse text prohibits "*knowingly* execut[ing], or attempt[ing] to execute, a scheme or artifice . . . to defraud a financial institution." 18 U.S.C. § 1344(1) (emphasis added). By using the word "knowingly," "[i]t is hard to imagine how Congress could have been clearer as to the mental state required for liability." *Loughrin v. United States*, 573 U.S. 351, 370 (2014) (Alito, J., concurring). After all, we ordinarily read the modifier "knowingly" when introducing a criminal statute as applying to all subsequent non-jurisdictional elements. *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019). And the only element that "knowingly" could possibly apply to in § 1344 is the execution (or attempted execution) of a scheme to defraud a financial institution.

So where, one might ask, did the "intent to defraud" element—and its connotation of a purposeful mens rea—come from? By all accounts, a nearly three-decades old decision by the First Circuit. To reconstruct that history, begin with our adoption of an "intent to defraud" element in *United States v. Hoglund*. *See* 178 F.3d at 413 (creating the three-part test); *see also supra* at 5 (tracing the test to *Hoglund*). Yet *Hoglund* seemingly crafted its three-element test from a decision by the First Circuit, *United States v. Brandon*, 17 F.3d 409 (1st Cir. 1994). *Hoglund*, 178 F.3d at 413. *Brandon* thus deserves renewed attention. The decision started innocently enough: it employed a three-part test for measuring violations of § 1344—a test that was far more loyal to § 1344's text, and one that conspicuously *lacks* an "intent to defraud" element. Specifically, *Brandon* held that § 1344(1) requires the prosecution to prove beyond a reasonable doubt that the defendant "(1) engaged in a scheme or artifice to defraud. . . ; (2) a federally insured financial institution; and (3) did so knowingly." 17 F.3d at 424. But *Brandon* went on to ask whether the defendant acted with the "intent to defraud," which it defined as the "specific intent to deceive or cheat for the purpose of either causing some financial loss to

another, or bringing about some financial gain to oneself." *Id.* at 425 (citations omitted).  In line with other purposivist decisions of that era, *Brandon* viewed a state of mind requirement as implicit in § 1344's reference to a "scheme" along with Congress's purported overarching purpose in enacting the bank fraud statute.  *Id.* (quoting *United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989)); *see also United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992) (adopting a mens rea of "intent to deceive and intent to cause actual harm" after consulting the bank fraud statute's legislative history and concluding that it should be read in line with the mail and wire fraud statutes); *United States v. Nkansah*, 699 F.3d 743, 748 (2d Cir. 2012) (citing *Stavroulakis* and its discussion of legislative history to conclude § 1344(1) is a "specific intent crime").

The net result was a mens rea of purposefulness being grafted onto the statute.  Doing so, however, "read[] the word 'knowingly' out of the statute." *Cf. Loughrin*, 573 U.S. at 371 (Alito, J., concurring) (distinguishing between what the statute requires concerning the "design of the scheme" under § 1344(2)—"obtaining of bank property"—and the "*mens rea* of the defendant" established by § 1344's preface).  And with the text of § 1344 long forgotten, the amorphous "intent to defraud" element invited expansive judicial interpretations, often to the dismay of defendants.  For instance, we have held that under the "intent to defraud" element, the government need not show that the defendant "intended to" "put the bank at risk of loss" so long as the defendant intended to commit fraud on anyone and used a bank during the fraud.  *Everett*, 270 F.3d at 991.  That reading of the federal bank fraud statute, it bears emphasizing, massively expands § 1344(1)'s reach, "mak[ing] every fraud effected by receipt of a check a federal offense." *Cf. Loughrin*, 573 U.S. at 369 (Scalia, J., concurring) (discussing § 1344(2)).

Today, this line of cases is largely a remnant of a bygone era.  Especially so following the Supreme Court's intervening decision in *Shaw*. *See United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010) (recognizing that an "inconsistent decision of the United States Supreme Court requires modification of the earlier panel decision") (citations and quotations omitted).  *Shaw* rejected the view that the government must show something "more than [the defendant's] simple *knowledge* that [the defendant] would likely harm the bank's property interest" to prove bank fraud.  580 U.S. at 468.  And it emphasized that, in view of § 1344(1)'s text, the government

need not "prove that" the defendant's "purpose" was to deprive a bank of its funds. *Id.* at 469. In other words, § 1344(1) requires that the defendant *know* that he is likely to deprive the bank of its property interests, but it does not require that the defendant have that *purpose* in mind. *Id.*

Ultimately, the significance of the knowledge requirement may only matter at the margins. By and large, "[p]roof that a defendant acted knowingly very often gives rise to a reasonable inference that the defendant also acted purposely." *Loughrin*, 573 U.S. at 371 (Alito, J., concurring). In that respect, proof as to the "scheme to defraud" element will almost invariably show a purpose to deprive a bank out of its property. *Id.* Nonetheless, the text of § 1344 coupled with *Shaw* demands a more precise statement of when § 1344(1) criminal liability arises. That is the case when a defendant (1) knowingly (2) executed or attempted to execute a scheme to defraud a financial institution; and (3) the financial institution was federally insured. Whether the defendant acted "purposely" is of no significance.

**(b).** Applying our clarified standard to the record before us, a mountain of circumstantial evidence demonstrated Skouteris's knowledge that depositing unauthorized settlement checks into his own account was likely to wrongfully deprive the bank of its property. *See Staples v. United States*, 511 U.S. 600, 615–16 n.11 (1994) (observing that a person's knowledge can be inferred from circumstantial evidence). Expert testimony indicated that Skouteris was "capable of having the mental ability to form and carry out complex thoughts, schemes, and plans." Lay witness testimony was to the same end. Former clients and colleagues described Skouteris as a detail-oriented lawyer who did not exhibit signs of a diminished mental capacity. Jurors also heard that Skouteris repeatedly lied to clients about the status of their settlements, suggesting that he knew he was engaged in deception when cashing the settlement checks. On top of that, the jury heard from a parade of witnesses who collectively explained that for the better part of a decade, Skouteris engaged in this pattern of behavior with more than half a dozen clients, suggesting that his actions were no accident. Consider, for example, that Skouteris continued to forge client signatures even after being confronted by fellow attorneys and sued over his conduct. That evidence is reliable proof that Skouteris knew the likely consequences of his behavior. *See Dowlen*, 514 F. App'x at 563 ("[E]ven if the court assumes that Dowlen's

criminal intent was not clear before the warning, there is no explanation other than an intent to defraud for his actions after the warning."); *see also Abboud*, 438 F.3d at 593–94.

Skouteris's arguments to the contrary are many. But none are persuasive. First, he asserts that *Shaw* requires proof of a "specific intent to deceive." That quote, however, comes from *Shaw*'s description of the *petitioner's* argument. 580 U.S. at 66. And Skouteris otherwise does not grapple with *Shaw*'s express rejection of any mens rea beyond knowledge. Second, Skouteris argues that for those clients to whom he provided some of the settlement proceeds, he could not have formed the requisite mens rea. But Skouteris's intentions toward his clients, even if benign, are irrelevant; § 1344's "knowingly" requirement concerns his knowledge of the likely results of his actions with respect to a financial institution. *See United States v. Guzman*, 731 F. App'x 459, 463 (6th Cir. 2018). Next Skouteris paints the operation of his law practice and business as merely negligent. Yet the jury heard and rejected this alternative explanation for Skouteris's actions. In this sufficiency setting, we cannot reweigh the evidence or take on the jury's role to decide whether Skouteris or the government had the better case. *Miller*, 982 F.3d at 440. Finally, Skouteris contends that the government's witnesses contradicted themselves. But "attacks on witness credibility" are also beyond today's scope. *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004) (citations omitted). As the record amply demonstrated Skouteris's guilt as to each element, we do not take issue with the jury's conclusions.

**B.** We now turn to Skouteris's challenges to the jury instructions. When a defendant preserves an objection to a proposed jury instruction, we review the refusal to give the instruction for an abuse of discretion. *United States v. Hills*, 27 F.4th 1155, 1188 (6th Cir. 2022). Such an abuse occurs when (1) the denied instruction correctly states the law; (2) the actual instruction did not substantially cover the denied instruction; and (3) the refusal to give the denied instruction substantially impaired the defense. *United States v. Henderson*, 2 F.4th 593, 597 (6th Cir. 2021). When a defendant fails to object to a particular instruction, however, we review for plain error. *See United States v. Eaton*, 784 F.3d 298, 307 (6th Cir. 2015). That requires a showing that the instructions, taken as a whole, were so "clearly wrong" that they produced a grave miscarriage of justice. *Id.*

Skouteris first argues that there should have been a specific instruction "as to diminished capacity" with respect to his "CTE . . . negating" the state-of-mind requirement. As he preserved this objection, we review for abuse of discretion. *Hills*, 27 F.4th at 1188. The crux of Skouteris's argument is that his proposed instruction would have detailed § 1344(1)'s "specific intent" requirement and informed the jury that his mental capacity prevented him from acting "with the purpose of violating law, something more than just a knowing violation." At the outset, however, Skouteris's diminished capacity argument has an obvious flaw—Skouteris needed to act with knowledge, not purpose, to violate § 1344(1). *See Shaw*, 580 U.S. at 69.

In any event, even if Skouteris were arguing that the instruction was needed to negate § 1344(1)'s knowledge element, *see, e.g.*, *United States v. Odeh*, 815 F.3d 968, 978–79 (6th Cir. 2016), his proposed instructions were substantially covered by the actual jury charge. Skouteris's proposed instructions said very little. Conspicuously, they never mentioned CTE or its effect on his state of mind. The instructions further failed to define what a "diminished mental capacity" entails, stating only that a "diminished mental capacity may be inconsistent with the requisite culpable state of mind. . . ." The district court's mens rea instructions clearly explained that a knowing act is not one caused by "mistake or some other innocent reason." Such instructions adequately apprised the jury of the same legal position set forth in Skouteris's proposed instructions. *See United States v. Blanchard*, 618 F.3d 562, 574 (6th Cir. 2010). A failure to explicitly use the term "diminished capacity" does not make an instruction deficient. *See United States v. Kean*, 1991 WL 270828, at *4, 951 F.2d 350 (Table) (6th Cir. 1991) (per curiam); *see also United States v. Simmonds*, 931 F.2d 685, 689 (10th Cir. 1991) (collecting cases).

Second, Skouteris contends that the trial court's instructions failed to "admonish the jury against using" Williams's and Levick's testimony "for propensity purposes," in violation of Rule 404(b)(1). As he did not object to the 404(b) cautionary instructions given by the district court, we review for plain error, something that amounts to a "grave miscarriage of justice." *Eaton*, 784 F.3d at 307. Review of the record reveals no error, let alone one of that magnitude. The district court's repeated reminders during trial as well as the jury instructions themselves put the jury on notice as to the specific purpose for which Williams's and Levick's testimony was to be

used.  As we presume that juries follow limiting instructions concerning Rule 404(b) evidence, we see no plain error here.  *See United States v. Ingram*, 846 F. App'x 374, 381 (6th Cir. 2021) (citing *United States v. Steele*, 919 F.3d 965, 973 (6th Cir. 2019)).

**C.**  With Skouteris's conviction affirmed, we turn to his sentence.  Skouteris maintains that his sentence was both procedurally and substantively unreasonable.  A sentence may be procedurally unreasonable if, for instance, the district court miscalculates the Guidelines range, considers an impermissible factor during sentencing, or fails to adequately explain the chosen sentence. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).  In contrast, a substantive reasonableness challenge focuses on the length of the sentence itself, *see United States v. Clayton*, 937 F.3d 630, 643 (6th Cir. 2019), asking if the sentence is "too long (if a defendant appeals) or too short (if the government appeals)." *Rayyan*, 885 F.3d at 442.  Typically, challenges to the reasonableness of a sentence are reviewed for abuse of discretion, meaning we grant relief only for an error of law, a clearly erroneous finding of fact, or where we are otherwise left with the "definite and firm conviction" that the district court clearly erred. *See United States v. Hymes*, 19 F.4th 928, 932–33 (6th Cir. 2021) (citations omitted).  But unpreserved procedural challenges are reviewed for plain error, requiring an obvious error that would result in a miscarriage of justice without reversal. *Id.* at 933.  With this rubric in mind, we turn first to Skouteris's procedural error arguments.

**1.**  Skouteris maintains that the district court erred in applying a 12-level enhancement by miscalculating the "loss" amount under U.S.S.G. § 2B1.1(b)(1)(G).  Section 2B1.1 of the Guidelines governs offenses involving fraud and deceit and metes out enhancements based on loss amount. *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021).  The probation office's presentence report considered relevant conduct that included 12 different instances of Skouteris forging his client's signature and depositing a settlement check into his own account.  Based on the face of these forged checks, the report suggested Skouteris's conduct had an "intended loss" of $392,230.57.  Skouteris did not challenge these factual findings or the resulting calculations, so the district court accepted them and applied the enhancement under U.S.S.G. § 2B1.1(b)(1)(G) for losses between $250,000 and $550,000.

Today, Skouteris argues that the $392,230.57 was overstated because it included amounts where the actual losses suffered by two victims were less than the face value of the forged settlement checks. As this is a new argument, plain error review governs. *See Hymes*, 19 F.4th at 933. Compounding matters for Skouteris, he fails to grapple with the Guidelines commentary's view that loss amount is defined as the greater of actual *or* intended loss, with the latter defined as the "pecuniary harm that the defendant purposely sought to inflict," U.S.S.G. § 2B1.1, cmt. 3(A)(ii). No party contests the applicability of this rule, so we assume that the commentary permissibly interprets the term "loss" as "intended loss." *See United States v. Hill*, 963 F.3d 528, 531–33 (6th Cir. 2020). And we have repeatedly blessed intended loss calculations based on the face value of a fraudulently deposited check. *See, e.g.*, *United States v. Thomas*, 841 F. App'x 934, 938 (6th Cir. 2021); *United States v. Vysniauskas*, 593 F. App'x 518, 524 (6th Cir. 2015); *United States v. Tate*, 136 F. App'x 821, 826–27 (6th Cir. 2005). Given this state of affairs, we see no "clear or obvious" error in the district court's application of the U.S.S.G. § 2B1.1(b)(1)(G) enhancement. *See Puckett v. United States*, 556 U.S. 129, 135 (2009).

Skouteris also suggests that unindicted conduct should not be considered as "relevant conduct" when calculating losses under U.S.S.G. § 2B1.1(b)(1). His argument, however, is in tension with the Guidelines. The Guidelines understand "relevant conduct" to include all acts that were part of the same "common scheme or plan as the offense of conviction," regardless of whether that act was the specific subject of the indictment. *See* U.S.S.G. § 1B1.3(a)(2); *see also United States v. Benton*, 957 F.3d 696, 700 (6th Cir. 2020). Here, all of the conduct that is the subject of the loss calculation not only occurred during the time contemplated in the indictment, but it also involved nearly identical deeds to the offenses of conviction—namely, unauthorized settlement and forgery of settlement checks. Accordingly, the district court did not err, plainly or otherwise, in including unindicted conduct in the loss calculation. *See, e.g.*, *United States v. McDaniel*, 398 F.3d 540, 553 (6th Cir. 2005) (determining relevant conduct in terms of federal bank fraud conviction).

Finally, Skouteris claims that the district court erred by failing to "put its reasoning on the record as to its computation of total amount of loss." But any silence by the district court on this

front seemingly traces back to Skouteris's own silence on the topic. By all accounts, Skouteris never challenged the computation made in the presentence report. With that in mind, the district court did not plainly err by accepting the calculations therein. *See Carter*, 355 F.3d at 925 (holding that "[t]he district court is allowed to accept as true all factual allegations in a presentence report to which the defendant does not object") (citation omitted); *see also Gall v. United States*, 552 U.S. 38, 54 (2007) (observing that it is "not incumbent on the District Judge to raise every conceivably relevant issue on his own initiative.").

**2.** Next Skouteris argues that the district court erred in applying a two-level enhancement for conduct that "resulted in substantial financial hardship" to Williams under U.S.S.G. § 2B1.1(b)(2)(A)(iii). This relatively new enhancement focuses on the "extent of the harm" to a particular victim, *United States v. Poulson*, 871 F.3d 261, 267 (3d Cir. 2017), and requires a showing that the loss was "more than minimal or trivial" as gauged by the victim's specific financial circumstances, *see United States v. Howder*, 748 F. App'x 637, 643–44 (6th Cir. 2018) (quoting *United States v. Minhas*, 850 F.3d 873, 878 (7th Cir. 2017)). The enhancement phrase "resulted in" contemplates causation. *See United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004). As a result, U.S.S.G. § 2B1.1(b)(2)(A) requires a showing of both but-for and proximate causation. *See United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020). But-for causation requires that the "substantial financial hardship" could not have occurred without the underlying offense, whereas proximate causation requires the harm to be the foreseeable result of the wrongful act. *Id.*

Skouteris's challenge to the substantial financial hardship enhancement has been a moving target. Before the district court, Skouteris conceded that Williams suffered a substantial financial loss yet maintained that it was inappropriate to apply the enhancement because Williams was "not included in the indictment." Yet on appeal, Skouteris has abandoned that argument. Instead, he takes issue with whether the government can satisfy § 2B1.1(b)(2)(A)'s causation requirement: whether it was foreseeable that Skouteris's theft of Williams's settlement funds would result in Williams undertaking student loans.

As Skouteris did not make this particular argument before the district court, we review for plain error. *United States v. Johnson*, 627 F.3d 578, 585 (6th Cir. 2010). Skouteris does not

clear this high bar. *Hymes*, 19 F.4th at 932–33. That is so for numerous reasons. For one, Skouteris points to no binding case law suggesting that it is unforeseeable that a victim of fraudulent activity will undertake debt in reliance on the fraud. And a lack of binding case law that answers the question presented precludes a finding of plain error. *United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013). For another, Skouteris misreads the record. True, as he emphasizes, Williams made a passing comment at trial about her decision to attend graduate school at Tulane. But nothing suggests that the district court applied the substantial financial hardship enhancement due to that comment. By all accounts, the government pursued the enhancement because Williams, injured in a horrific accident, suffered significant financial harm after Skouteris deprived her of her settlement, leaving her with "substantial medical bills" and "long-term" credit damage. This view of how Skouteris's offense "resulted" in a loss to Williams, it bears adding, aligns with examples offered by the Guidelines' commentary. *See* U.S.S.G. § 2B1.1 cmt. 4(F)(vi) ("[T]he court shall consider . . . whether the offense resulted in the victim . . . suffering substantial harm to his or her ability to obtain credit."). We thus see no plain error in applying the enhancement.

**3.** Skouteris also maintains that the district court should have departed from the applicable Guidelines range for diminished capacity under U.S.S.G. § 5K2.13. Section 5K2.13 allows for a downward departure from the applicable Guidelines range if the defendant acted while under a "significantly reduced mental capacity" that contributed substantially to the offense. A district court's refusal to depart downward, however, is normally not reviewable on appeal, absent clear evidence that the court was unaware of or did not understand that it had the discretion to make such a departure. *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008). The record here shows that the district court was aware of Skouteris's request for a departure, but, like the jury, was simply unpersuaded that Skouteris's mental state "significantly contribute[d] to the actions that he had committed." As such, we cannot review Skouteris's argument.

**4.** Finally, Skouteris suggests that his sentence was substantively unreasonable. Given that within-Guidelines sentences are presumptively reasonable, Skouteris faces a nearly impossible task: showing that his sentence, which varied downward from the bottom of the

calculated range by 16 months, was too long. *See United States v. Nunley*, 29 F.4th 824, 834 (6th Cir. 2022). Skouteris notes in passing that his conduct was not "egregious" in that at least some clients did "benefit" from his "labor." But the district court thoughtfully considered the seriousness of Skouteris's offense and balanced those concerns against other relevant § 3553(a) factors to arrive at a sentence below the Guidelines range. Lacking a "definite and firm conviction" that the district court clearly erred by not imposing an even lower sentence, Skouteris's substantive reasonableness challenge fails. *See Hymes*, 19 F.4th at 933.

**D.** Skouteris's final arguments take aim at the district court's restitution order. Under the Mandatory Victim Restitution Act, a district court must "order restitution" from a defendant convicted of certain offenses (including federal bank fraud) "if an identifiable victim has suffered a loss." *See Hills*, 27 F.4th at 1201 (citing 18 U.S.C. § 3663A); *United States v. Churn*, 800 F.3d 768, 781–82 (6th Cir. 2015) (applying the MVRA to a § 1344 defendant). Ordinarily, we review de novo whether a restitution order is permitted under the law, with the restitution amount reviewed for an abuse of discretion. *See United States v. Wood*, 364 F.3d 704, 714 (6th Cir. 2004). But when a defendant fails to object to the order's permissibility, we review for plain error. *United States v. Sexton*, 894 F.3d 787, 799 (6th Cir. 2018). And when a defendant intentionally relinquishes or abandons his right to challenge the amount of the order by "expressly" "withdrawing [an] objection[]" or "agree[ing]" to the calculated restitution amount, a waiver has occurred, meaning we do not review any challenge on appeal. *United States v. Morrison*, 1997 WL 636623, at *3–4, 125 F.3d 856 (Table) (6th Cir. 1997); *see also United States v. Nazzal*, 644 F. App'x 655, 658 (6th Cir. 2016); *United States v. Venturella*, 585 F.3d 1013, 1018 (7th Cir. 2009).

Skouteris focuses on two restitution awards: one to Jacqueline Smith-Ehrat and another to Williams. With regard to Smith-Ehrat, he argues that the district court erred in ordering restitution of $1,700 to her when, he claims, "she received her settlement." Skouteris waived that argument, however, by expressly proposing that exact amount below.

As to the Williams restitution order, Skouteris does not press the argument made in the district court—that the award should have been reduced to account for Skouteris's attorney's fees. Instead, he suggests (with little explanation) that Williams's actual loss was $56,000, not

the $77,882 ordered. With Skouteris making this argument in such "a perfunctory manner, unaccompanied by some effort at developed argumentation" the argument is forfeited, so we need not consider it any further. *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

Finally, Skouteris maintains that a lien still exists against Williams that would reduce the restitution amount. Even if that were the case, it would not mean that Skouteris owed any less money to Williams. Rather, the lienholder would have a right to any restitution Williams receives. *See, e.g.*, *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 368 (2006) ("A subrogation lien is not an express lien based on agreement, but instead is an equitable lien impressed on moneys on the ground that they ought to go to the insurer.") (citations and quotations omitted).

**III.**

For the aforementioned reasons, we affirm the judgment of the district court.