NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0213n.06

Case No. 24-5828

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 14, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| JEFFREY R. OWEN, | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: CLAY, GIBBONS, and HERMANDORFER, Circuit Judges.

HERMANDORFER, Circuit Judge. In Defendant-Appellant Jeffrey Owen's telling, he is an eternally optimistic real-estate entrepreneur. But Owen's business dealings were not what they seemed. As the Government's proof showed, Owen wove a web of fraudulent misrepresentations and transactions so that Owen and his wife, Dr. Kimberly D. Owen, could hide their liabilities from lenders; shield their assets from creditors; and avoid ever making good on their debts. Owen and Kimberly masked the proceeds of their fraudulent dealings using related bank accounts they controlled.

Kimberly pled guilty for her role in the scheme. But Owen opted to proceed to trial, where a jury convicted him on seven counts for his financial crimes. The district court sentenced Owen to 136 months' imprisonment.

Owen now raises a litany of challenges covering a range of sufficiency issues, evidentiary and instructional rulings, and asserted sentencing errors. Because the district court committed no reversible error, we affirm Owen's conviction and sentence.

I

A

This criminal proceeding stems from a series of related transactions, entities, and lawsuits that span over a decade. For present purposes, we give an overview of Owen and Kimberly's efforts to procure bank loans, evade collection by creditors, and disguise the source and use of funds obtained as part of their financial schemes.

In May 2013, Owen and Kimberly organized an entity, CD Management of Shelbyville, Inc., to acquire commercial real estate. Evidence established that Kimberly incorporated the company and served as its registered agent, while Owen operated as its "spokesman." Trial Tr. Vol. 1, R.217, PageID 2439. Owen also "ran the day-to-day operations" of the company. *Id.* Throughout 2013, CD Management of Shelbyville applied for, and Citizens Union Bank (CUB) and Eclipse Bank (Eclipse) approved, collateralized loans totaling $1,492,000 to purchase four properties.

By March 2014, Kimberly had taken over management of another entity, CD Management, LLC, from a "long-time business partner" of Owen's. Trial Tr. Vol. 2, R.221, PageID 2621. American Founders Bank (AFB) subsequently approved a collateralized loan of $144,000 for CD Management, LLC, to purchase a fifth property.

Owen was the primary point of contact with each bank during the loan application and approval process. He provided the banks "with all the documentation" and "the records that they

requested[] in the origination process." *Id.* at PageID 2617. That included Kimberly's personal financial statements, which Owen filled out and submitted to the banks.

Owen omitted an array of relevant debts and liabilities from Kimberly's personal financial statement. Owen failed to disclose: (1) a promissory note that Kimberly and Owen owed to Sam Wheatley; (2) a guarantee that Kimberly and Owen owed to Allison Mortgage for $200,957.15; (3) a promissory note that Kimberly and Owen owed to DCR Mortgage III Sub, I, LLC (DCR), for $80,000; (4) over $100,000 in unpaid tax liabilities; (5) a "litany of small judgments and tax debts" owed by Kimberly, *id.* at PageID 2632; and (6) a debt of $865,000 that Kimberly owed to CD Management, LLC. Owen also provided CUB a copy of a forged letter on his accountant's letterhead stating that the commercial properties that CD Management of Shelbyville sought to purchase operated at a profit. But all five properties were in fact operating at a loss.

Owen needed Kimberly to obtain the commercial loans because he had an outstanding tax judgment for $7,379,887.19 plus interest. Had Owen been listed as the manager of either CD Management of Shelbyville or CD Management, LLC, during the loan application process, or if he had been used as a guarantor, the banks would have learned of his outstanding tax debt and likely denied the applications. After the loans were approved, however, Owen formally took over management of both CD Management of Shelbyville and CD Management, LLC.

As manager of CD Management of Shelbyville, Owen submitted false insurance claims for repairs at the mortgaged properties. Owen sent e-mail invoices to Eclipse and Secura Insurance Company reporting that he had paid a business named Monteray Rehab for repairs related to vandalism. Owen asserted that he paid $25,000 in cash to his brother, who worked for Monteray. But the invoices for Monteray's alleged work were purportedly sent from someone named Jimmy Anderkin—a man who had died years before the date on the invoices. Later, to access funds

reserved in escrow for property repairs, Owen instructed an HVAC technician to falsely tell Eclipse that the technician had spent $5,000 of his own funds to replace air conditioners on the property. Owen also told the technician to "add 10,000 to the quote" because it was "an insurance job" and they were going to install furnaces in addition to the air conditioners. Trial Tr. Vol. 4, R.223, PageID 3146.

The banks were not Owen and Kimberly's only creditors. As mentioned above, a separate company called DCR was owed over $80,000 and had been attempting to recover that sum since 2006. After DCR filed an action against Owen and Kimberly to obtain the money owed, a state court granted summary judgment to DCR in August 2009 (the DCR judgment). By operation of DCR's agreement with its insurer, Commonwealth Land Title Insurance Company (Commonwealth), Commonwealth paid DCR for the debt and stepped into DCR's shoes for the litigation against Owen and Kimberly.

Owen and Kimberly's financial machinations continued in the summer of 2014. First, on June 19, 2014, CD Management, LLC—which at that point Kimberly managed—sued Kimberly to collect on her outstanding debt to the company, then totaling $1,176,822.95, including interest. The same day, the parties filed an agreed judgment for the outstanding balance. Kimberly was on both sides of the suit: She signed the judgment on behalf of CD Management, LLC as plaintiff, and on her own behalf as the individual defendant.

Meanwhile, Commonwealth still had not collected on the DCR judgment. During a July 2014 deposition related to Commonwealth's collection efforts, Owen made a number of false statements. He testified that Kimberly had no assets in her own name other than the couple's residence, and that neither he nor Kimberly had a personal checking account. Kimberly's personal financial statements from December 2013, however, listed nearly $2.5 million in total assets; that

amount included $24,750 in a checking account, $165,000 in savings, stocks worth $24,195, an IRA worth $247,123, annuities worth $47,751, an automobile worth $76,100, real estate valued at approximately $1.4 million, and stock in Mortenson Family Dental valued at approximately $500,000. Owen also testified that Kimberly had her own dental practice—Kim Owen, DMD, Inc. But Kimberly never owned her own dental practice; instead she worked at Mortenson Family Dental. Owen and Kimberly also provided false answers to interrogatories to conceal their assets from Commonwealth: They falsely claimed that Owen's brother owned CD Management of Shelbyville and that Kimberly did not play a role in either CD Management of Shelbyville or CD Management, LLC.

During his deposition, Owen also told Commonwealth that creditors were garnishing Kimberly's wages. But on the day of that deposition, no one was garnishing Kimberly's wages. Instead, Kimberly and Owen effectuated a self-garnishment the very next day. They did so through the suit Kimberly had brought and settled against herself on behalf of CD Management, LLC. Specifically, Kimberly—in her capacity as manager of CD Management, LLC—used the consent judgment from that suit to facilitate the garnishment of her wages from her employer, Mortenson Family Dental. That meant that her employer would withhold a percentage of her wages; checks for that amount would in turn be sent to CD Management, LLC. The effect of Kimberly's self-garnishment was to block all other creditors from garnishing her wages.

By August 2015, CD Management of Shelbyville was in default on its loans from Eclipse. Owen provided Eclipse with an updated personal financial statement for Kimberly that, once again, failed to disclose the sizable debt Kimberly owed to CD Management, LLC, and the subsequent garnishment for the same. After entering an agreed judgment with the Owens in 2018, Eclipse attempted to garnish Kimberly's wages. But Kimberly's employer told Eclipse that no funds could

be withheld due to a superior or earlier garnishment. Eclipse eventually filed two foreclosure actions related to the defaulted loans. In December 2018, a judgment and order of sale were entered for one of Eclipse's foreclosure actions.

The following month, Owen filed a bankruptcy petition on behalf of CD Management of Shelbyville; that in turn stayed Eclipse's pending foreclosure actions. The bankruptcy petition listed a debt for $27,000 to Wintersteen General Contracting, located at 164 Fallen Branch Ct., Mount Washington, KY 40047. But no company named "Wintersteen General Contracting" in fact existed. Brothers Steve and Ken Wintersteen had done construction work for Owen under the business name "Wintersteen Brothers," but denied being owed $27,000 by Owen. Trial Tr. Vol. 2, R.221, PageID 2721. And the brothers disclaimed any association with 164 Fallen Branch Ct., which was Owen's brother's address. All other third-party unsecured debts listed in specific amounts in the petition were owed to Eclipse.

All the while, Owen and Kimberly took steps to disguise the destination of funds obtained through their self-coordinated garnishment. They did so by depositing the proceeds of the garnishment checks purportedly for the debt owed to CD Management, LLC, into accounts used for personal expenditures. At first, those checks were made out to "Kim Owen" or "CD Management, LLC," but in 2015, the payee changed to just "CD Management," without the "LLC" designation. Trial Tr. Vol. 5, R.225, PageID 3233-35. That permitted the checks to be deposited into a different, but similarly named, account the Owens controlled for CD Management of Shelbyville. The Owens would then write checks from the CD Management of Shelbyville account and deposit them into an account named Kim Owen, DMD, Inc. Although the name of the Kim Owen, DMD, Inc., account suggested that it was for a business, the Owens used the funds in that account for personal expenses.

For example, in November 2016, a garnishment check for $8,992.24 was deposited in the CD Management of Shelbyville account. Kimberly then wrote a check from that account to Kim Owen, DMD, for $8,980, causing an interstate wire communication. In May 2018, another garnishment check addressed to CD Management for $2,190.61 was deposited into the CD Management of Shelbyville account. Owen then wrote a check from that account to Kim Owen, DMD, for $2,180. And in August 2018, another garnishment check, payable to CD Management for $5,079.48, was deposited in the CD Management of Shelbyville account. Owen then wrote a check from the CD Management of Shelbyville account to Kim Owen, DMD, for $5,000, causing an interstate wire communication. These funds were used for purchases at stores like Target, Nordstrom, Gap, Bath and Body Works, and Trader Joes, and to pay off Kimberly's credit cards and student loans.

B

A federal grand jury indicted Owen on nine counts[1]: conspiracy to commit bank fraud under 18 U.S.C. § 1349 (Counts 1 and 3); bank fraud related to the false statements in the loan-application process with CUB, AFB, and Eclipse under 18 U.S.C. §§ 2 and 1344(2) (Count 2); bank fraud related to a fraudulent scheme to prevent Eclipse from collecting on its debt under 18 U.S.C. §§ 2 and 1344(1) (Count 4); bankruptcy fraud related to false statements in the bankruptcy petitions for CD Management, LLC and CD Management of Shelbyville under 18 U.S.C. § 152(3) (Counts 5 and 6); wire fraud related to a fraudulent scheme to prevent the holder of the DCR judgment from collecting on its debt under 18 U.S.C. § 1343 (Counts 7 and 8); and money laundering related to concealing proceeds of wire fraud as charged in Counts 7 and 8 under 18 U.S.C. § 1956(a)(1)(B)(i) (Count 10).

---

[1] Although the superseding indictment contains ten counts, Count 9 pertains only to Kimberly.

Before trial, the United States provided notice of intent to introduce evidence of Owen's prior bad acts, including a tax judgment against Owen for $7,379,887.19 plus interest and an agreed order requiring Owen to report to the IRS his involvement in "any new or previously unknown business entity." Mot. in Limine, R.97, PageID 583. The Government asserted that the tax judgment was probative of Owen's "motive, intent, and plan" to "obtain financing" using Kimberly "as a nominee." *Id.* at PageID 596. The district court granted the Government's motion to admit the tax judgment over Owen's objection. The district court also dismissed Counts 5 and 6 before trial on the United States's motion.

After a seven-day trial, a jury convicted Owen on remaining Counts 1, 2, 3, 4, 7, 8, and 10. At sentencing, the district court determined that Owen's Guidelines sentencing range was 121 to 151 months' imprisonment based on an offense level of 31 and a criminal-history score of 2.[2] After considering the 18 U.S.C. § 3553(a) factors, the district court sentenced Owen to 136 months' imprisonment to be followed by three years of supervised release. The district court also ordered substantial restitution and a hefty fine.

Owen timely appealed. On appeal, he challenges: (1) the lawfulness of the indictment and the sufficiency of the evidence supporting his convictions; (2) the admissibility of certain evidence at trial; (3) the propriety of the jury instructions; and (4) the calculation of his sentence. We address each argument in turn.

---

[2] Throughout this opinion we refer to the 2023 U.S. Sentencing Guidelines, which controlled during Owen's sentencing. *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").

II

We begin with Owen's challenges to the indictment and the sufficiency of the evidence on all seven convicted counts.

"An indictment is 'sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy.'" *United States v. Rankin*, 929 F.3d 399, 404-05 (6th Cir. 2019) (citation modified). Because Owen raises his challenges to the indictment for the first time on appeal, we review the indictment's sufficiency for plain error. *See United States v. McReynolds*, 964 F.3d 555, 561 (6th Cir. 2020). That means Owen "must show (1) error, (2) which is clear or obvious, rather than subject to reasonable dispute, (3) which has affected his substantial rights, and (4) which seriously impugns the fairness, integrity, or public reputation of judicial proceedings." *Id.* That "bar" is "extremely high and overcome only in exceptional circumstances." *United States v. Johnson*, 627 F.3d 578, 586 (6th Cir. 2010) (citation modified). At least on plain error review, "[w]e also construe the indictment liberally in favor of its sufficiency and will reverse the conviction only if we cannot reasonably construe the indictment to charge a crime." *United States v. Raymore*, 965 F.3d 475, 486 (6th Cir. 2020).

Owen likewise faces a "very heavy burden" in challenging the sufficiency of the evidence. *United States v. Robinson*, 813 F.3d 251, 255 (6th Cir. 2016) (citation omitted). The relevant question for this Court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sease*, 659 F.3d 519, 523 (6th Cir. 2011) (quoting *Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979)). Owen preserved his sufficiency-of-the-evidence challenge to each count, so we engage in de novo review. *See Robinson*, 813 F.3d at 255.

We consider in turn Owen's challenges to the bank-loan-application offenses, bank-loan-collection offenses, DCR/Commonwealth-related offenses, and money-laundering offense. None of Owen's challenges has merit.

A

Counts 1 and 2 of the superseding indictment charged Owen with violating 18 U.S.C. §§ 1349 and 1344(2), respectively.

Section 1349 imposes criminal liability on any person who "conspires to commit" a federal fraud offense. 18 U.S.C. § 1349. To convict, the Government must prove that "two or more persons conspired, or agreed, to commit" bank fraud, and that the defendant "knowingly and voluntarily joined the conspiracy." *United States v. Palma*, 58 F.4th 246, 249 (6th Cir. 2023); *see also United States v. Adeleke*, No. 23-3077, 2024 WL 1134645, at *3 (6th Cir. Mar. 15, 2024). Section 1344(2) imposes criminal liability on "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. A defendant violates § 1344(2) when he (1) has the "intent 'to obtain bank property,'" and (2) obtains that property through fraudulent means. *Loughrin v. United States*, 573 U.S. 351, 355-56 (2014) (citation omitted). The second element "is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank . . . to part with money in its control." *Id.* at 363.

The indictment sufficiently charges Owen with violating §§ 1349 and 1344(2). Count 1 of the indictment recites the elements of § 1349 as relevant to Owen's alleged bank-fraud scheme.

Count 2 does the same with respect to § 1344(2)'s elements. The indictment then sets out, in detail, the "essential facts constituting the offense[s] charged" in Counts 1 and 2, *United States v. Howard*, 947 F.3d 936, 943 (6th Cir. 2020) (citation omitted), including by identifying the alleged misrepresentations and fraudulent acts, the existence of multiple victims, and the property subject to the charged scheme. That content was sufficient to apprise Owen of the charged offenses.

The trial evidence was likewise sufficient to support the jury's conviction on Counts 1 and 2. Through documents and witness testimony, the Government demonstrated that Owen and Kimberly together provided false information in personal financial statements, hid the fact that Owen was in significant debt and would be taking control of the debtor entities after the loans were approved, and submitted forged documents regarding the profitability of collateral properties. The trial evidence further showed that these actions were material to the banks' lending decisions; bank representatives confirmed that the truth of the Owens' finances would have materially affected the Owens' ability to obtain the loans. According to a representative from Eclipse, accurate information "would have stopped the lending process" completely. Trial Tr. Vol. 3, R.222, PageID 2967.

Owen's primary argument on Counts 1 and 2 is that he did not deprive the banks of any property. Rather, in Owen's telling, "the banks received what they bargained for"—that is, "secured obligations to repay the loans over time." Owen Br. 15. But the bank-fraud statute requires only that Owen "obtain[ed]" bank "property" by means of false representations—it says nothing about what the bank may or may not have received in exchange. 18 U.S.C. § 1344(2). As the Supreme Court recently explained in the context of the federal wire-fraud statute, 18 U.S.C. § 1343, "[a] thing is no less 'obtained' simply because something *else* is simultaneously given in return," *Kousisis v. United States*, 605 U.S. 114, 123 (2025) (emphasis in original). Here, there

was abundant trial evidence demonstrating that Owen "obtain[ed]" bank property—that is, $1,636,000 of loan proceeds[3]—by means of false representations. 18 U.S.C. § 1344(2). Thus, sufficient evidence supports Owen's convictions under 18 U.S.C. §§ 1349 and 1344(2).

B

Counts 3 and 4 of the superseding indictment relate to Owen and Kimberly's attempts to evade Eclipse's efforts to collect on its loan debts. As before, this set of counts charges Owen with § 1349 conspiracy and a substantive bank-fraud offense—this time, under § 1344(1).

Section 1344(1) imposes criminal liability on "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution[.]" 18 U.S.C. § 1344. Section 1344(1) violations require the Government to show three elements: that "a defendant (1) knowingly (2) executed or attempted to execute a scheme to defraud a financial institution; and (3) the financial institution was federally insured." *United States v. Skouteris*, 51 F.4th 658, 669 (6th Cir. 2022). As explained above, § 1349 covers conspiracies to commit federal fraud offenses—in this case, Owen and Kimberly's alleged scheme to defraud Eclipse in the bank's collection efforts. Owen's various challenges to these counts also fall short.

At the outset, the superseding indictment sufficiently charges the offenses alleged in Counts 3 and 4. The counts recite the elements of §§ 1349 and 1344(1), respectively. The indictment provides the facts underpinning the alleged offenses and asserts, among other things, that Owen and Kimberly "made false representations and made fraudulent use of legal processes: (1) to prevent, delay, and obstruct [Eclipse's] efforts to collect funds owed to [it]" and "foreclose on the commercial real estate that served as collateral to the loans . . . and (2) to force [Eclipse] to

---

[3] The loan proceeds include a loan of $465,000 from CUB, loans for $595,000 and $432,000 from Eclipse, and a loan of $144,000 from AFB.

expend excessive funds in legal fees in hopes that [Eclipse] would abandon its collection efforts and settle any claims for significantly less than what was owed" to it. Superseding Indictment, R.30, PageID 102, 105-06. It further details the fraudulent acts—including the self-garnishment judgment and false bankruptcy petition—at issue. The indictment was therefore constitutionally sufficient. *See Rankin*, 929 F.3d at 404-05.

So was the evidence of Owen's guilt on Counts 3 and 4. The evidence showed that Owen and Kimberly conspired to and knowingly used fraudulent means to prevent Eclipse from collecting on its debts. They did so by using an entity they controlled to garnish Kimberly's wages to shield them from creditors, submitting false maintenance-repair claims to obtain insurance funds that formed part of Eclipse's collateral, and filing a sham bankruptcy petition to stall Eclipse's foreclosure action. The intended result of Owen and Kimberly's "deception," *Skouteris*, 51 F.4th at 666, was to thwart Eclipse's efforts to recover its funds and thus defraud Eclipse out of the funds owed to it, *see* 18 U.S.C. § 1344(1); *United States v. Hattaway*, 658 F. App'x 765, 768-70 (6th Cir. 2016); *accord United States v. Ely*, 142 F.3d 1113, 1119 (9th Cir. 1997) ("You deprive a bank of property if you prevent its collection of debts that are due.").

Owen presses three counterarguments to the sufficiency of Counts 3 and 4. None is convincing.

*First*, Owen again asserts that the Government failed to prove that he "intended to deprive Eclipse of Eclipse's money or property." Owen Br. 18. That is because, in his view, Eclipse did not have "a property right in the particular funds at issue"—namely, those Owen and Kimberly owed Eclipse under the terms of the loans. *Id.* at 19. But that argument runs headlong into Supreme Court precedent holding that "[t]he right to be paid money has long been thought to be a species of property." *Pasquantino v. United States*, 544 U.S. 349, 356 (2005). Because "money

in hand and money legally due" are of "economic equivalence," a scheme designed to deprive the victim "of money legally due" is a scheme to deprive the victim of property. *Id*; *see also United States v. Maddux*, 917 F.3d 437, 444 (6th Cir. 2019). Eclipse had a legal right to recoup the funds disbursed under the loan agreements. So Owen violated § 1344(1) by fraudulently blocking Eclipse from property due to it under the commercial loans' terms.

*Second*, Owen contends that his Count 3 conspiracy conviction is invalid because "[t]he Government failed to present evidence" that Kimberly "knowingly participated in this conspiracy." Owen Br. 20-21. But Kimberly was the named manager of CD Management, LLC, at the time of the legal action giving rise to the fraudulent self-garnishment. Indeed, Kimberly signed the judgment that precipitated the garnishment as both plaintiff (on behalf of CD Management, LLC) and defendant. Further, a reasonable juror could have inferred that Kimberly intended to fraudulently shield assets from Eclipse by transferring the proceeds of the garnishment checks from the CD Management of Shelbyville account into the Kim Owen, DMD, account to fund her personal expenses. What's more, after defaulting on the loans, Kimberly signed an updated personal financial statement that again omitted the ongoing garnishment and large debt to CD Management, LLC. So contrary to Owen's assertion, Kimberly's role in the conspiracy to defraud Eclipse was shown by much more than her "mere participation as a defendant in the [self-garnishment] lawsuit." *Id.* at 21.

*Third*, Owen claims Counts 3 and 4 (the bank-loan-collection conspiracy and fraud counts) were multiplicitous with Counts 1 and 2 (the bank-loan-application conspiracy and fraud counts). As Owen sees it, the "two subsections of the bank fraud statute overlap," such that the crime underpinning Counts 3 and 4—violation of 18 U.S.C. § 1344(1)—is entirely subsumed within the

crime underpinning Counts 1 and 2—violation of § 1344(2). *Id.* at 49. As with Owen's other challenges to the indictment, we review this argument for plain error.

"A multiplicitous indictment raises double jeopardy concerns because it charges a single offense in more than one count." *United States v. Golobic*, 170 F.4th 515, 519 (6th Cir. 2026) (citation modified). But no violation "arises 'merely because the same evidence is used to establish more than one statutory violation if discrete elements must be proved in order to make out a violation of each statute.'" *Id.* (citation omitted). Rather, a "defendant must show an identity of *statutory elements* between the two charges against him[.]" *Currier v. Virginia*, 585 U.S. 493, 506 (2018) (plurality opinion) (emphasis in original).

Owen's dispositive problem is that he fails to identify any precedents that establish that the indictment here was multiplicitous. *See United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) ("A lack of binding case law that answers the question presented will [] preclude our finding of plain error."). On plain-error review, that "lack of binding precedent demonstrating the trial court's error forecloses relief." *United States v. Clay*, 162 F.4th 757, 769 (6th Cir. 2025) (per curiam). Indeed, if anything, Supreme Court guidance undercuts Owen's contention by instructing that the overlap between §§ 1344(1) and 1344(2) is substantial, but not "complete[]." *Shaw v. United States*, 580 U.S. 63, 70 (2016). That recognition reflects that only § 1344(1) requires proving "that a defendant intend to 'defraud a financial institution.'" *Loughrin*, 573 U.S. at 357. And our cases suggest that defendants can defraud a financial institution under § 1344(1) through schemes that do not aim to directly obtain property from a bank. *See United States v. Hall*, 979 F.3d 1107, 1117-18 (6th Cir. 2020) (fraudulently obtaining loan forbearance deprives a bank of something of value). Section 1344(2), by contrast, can encompass fraud directed at non-bank third parties in order to obtain "moneys, funds, credits, assets, securities, or other property owned by,

or under the custody or control of, a financial institution[.]" 18 U.S.C. § 1344(2); *see Loughrin*, 573 U.S. at 356-57; *see also United States v. Selgjekaj*, 678 F. App'x 379, 384 (6th Cir. 2017) ("While subsections (1) and (2) of § 1344 prohibit much of the same behavior, they do not overlap perfectly."). The indictment, trial evidence, and jury instructions, moreover, make clear the daylight between the § 1344(1) loan-application offense and the § 1344(2) loan-collection offense. *See infra* Part IV.A. No plain double-jeopardy error occurred.

C

Counts 7 and 8 relate to Owen and Kimberly's scheme to defraud Commonwealth—the insurer that held the debt related to the $80,000 DCR judgment against Owen and Kimberly. Those counts charge Owen with committing wire fraud under 18 U.S.C. § 1343. Section 1343 requires proving three elements: "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (citation omitted). The scheme or artifice to defraud must also include a material falsehood. *Neder v. United States*, 527 U.S. 1, 25 (1999).

The indictment sufficiently charged Owen for two interstate "wire communications," Superseding Indictment, R.30, PageID 110, made as part of a scheme to thwart recovery efforts on "the judgment obtained by DCR Mortgage," *id.* at PageID 107. The charges recite the wire-fraud elements and describe the various activities that Owen and Kimberly undertook in furtherance of the alleged scheme, including the alleged falsehoods. The indictment also gives

notice of the dates and descriptions of the wire communications underlying each count. That was sufficient to allege wire fraud.

Ample evidence supported the jury's wire-fraud verdict on Counts 7 and 8. Owen, among other acts, provided false testimony and interrogatory responses to conceal assets that would have otherwise been collectible by Commonwealth. And after the garnishment of Kimberly's wages was in place, Owen transferred the proceeds of the garnishment into a misleadingly named account to disguise personal use of those funds—in turn, causing interstate wire communications. Owen thus used "interstate wire communications in furtherance of" a fraudulent "scheme" to "deprive" Commonwealth of funds to which it was entitled. *Daniel*, 329 F.3d at 485.

Owen contests that any of his misrepresentations to DCR or Commonwealth were material. Among other reasons, Owen claims that Commonwealth "never pursued its claim" because it did not "sue in its own name"—meaning that any misrepresentations to Commonwealth could not have affected its right to recover on the debt. Owen Br. 25-26. But at all relevant times, DCR had a valid state-court judgment against Owen and Kimberly. DCR and Commonwealth, in turn, understood that Commonwealth maintained a right to enforce that judgment. Owen's effort to collaterally attack the DCR judgment in this federal criminal case fails. And his argument does not change the fact that he intended to frustrate Commonwealth's authorized collection efforts through false pretenses and using interstate wire communications. That conduct was sufficient to support his convictions on Counts 7 and 8.

D

Count 10, which relates to the concealment of the proceeds of unlawful activity, charges Owen with violating 18 U.S.C. § 1956(a)(1)(B)(i). That federal crime, also known as concealment money laundering, has three elements: "(1) use of funds that are proceeds of unlawful activity; (2)

knowledge that the funds are proceeds of unlawful activity; and (3) knowledge that the transaction is designed in whole or in part to disguise the source, ownership or control of the proceeds." *United States v. Warshak*, 631 F.3d 266, 319-20 (6th Cir. 2010) (citation modified).

Both the indictment and the evidence were sufficient to support Owen's conviction. The indictment sets out the elements of the offense and identifies one charged transaction in which Owen deposited the proceeds of a specific check into a specific bank account. The trial evidence, for its part, established that the account in question was the Kim Owen, DMD, bank account. Evidence also demonstrated that shortly after a garnishment check was deposited into the CD Management of Shelbyville account, Owen wrote the check identified in the indictment from the CD Management of Shelbyville account and deposited it into the Kim Owen, DMD, account. Evidence also established that although the name of the Kim Owen, DMD, account suggested that it was for a business, Owen and Kimberly in fact used it for personal expenses. That was sufficient for a jury to conclude that Owen knowingly used the proceeds of specified unlawful activity—*i.e.*, the funds obtained as part of a scheme to defraud Owen and Kimberly's various creditors—in a transaction designed to disguise the proceeds' source, ownership, or control. *See id.*

Owen argues that his money-laundering charge did not involve the "proceeds of specified unlawful activity" because the wire-fraud predicate offenses were not yet complete on the date of the charged money-laundering transaction. 18 U.S.C. § 1956(a)(1)(B)(i). Law and fact alike foreclose that response. On the law, a money-laundering conviction may stand so long as the proceeds involved in the transaction were derived from a "completed *phase*" of an offense, even if that offense remains "ongoing." *United States v. Kerley*, 784 F.3d 327, 344 (6th Cir. 2015) (emphasis added) (citation omitted). That rule makes sense where, as here, the predicate "wire-fraud statute prohibits the scheme to defraud, rather than the completed fraud." *United States v.*

*Page*, 163 F.4th 385, 395-96 (6th Cir. 2025) (citation modified). And regardless, the facts show that the foundational wire-fraud charge in Count 7 occurred over 18 months *before* the deposit underlying the money-laundering charge in Count 10. So the wire-fraud offense was indeed complete well before Owen's money-laundering conduct.

Contrary to Owen's contention, sufficient evidence also supported his purpose "to conceal or disguise the nature, the location, the source, the ownership, or the control" of the wire-fraud proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). The evidence at trial showed that the funds at issue were supposed to be paid to CD Management, LLC, but that the payee was later changed to CD Management. That move in turn enabled funds to be deposited into the CD Management of Shelbyville account. Owen then wrote the check from the CD Management of Shelbyville account—using funds derived from the garnishment that was being used to shield Kimberly's income from creditors—and deposited it into the Kim Owen, DMD, account. Finally, evidence established that the Kim Owen, DMD, account was used for personal expenses, despite being labeled in a manner suggesting that it was a business account. Such "a series of unusual financial moves culminating in the transaction" is evidence of intent to conceal. *United States v. McGahee*, 257 F.3d 520, 527-28 (6th Cir. 2001) (citation omitted). A reasonable jury could conclude that Owen's conduct evinced at least an intent "to conceal some characteristic of the funds involved." *Warshak*, 631 F.3d at 320.

## III

We turn next to Owen's evidentiary challenges. We generally review a district court's evidentiary decisions for abuse of discretion. *United States v. Gibbs*, 797 F.3d 416, 421 (6th Cir. 2015). A district court abuses its discretion "when its decision rests on the wrong legal standard, a misapplication of the correct standard, or on clearly erroneous facts." *Id.* at 422. If the defendant

did not object to the admission of certain evidence or testimony at trial, "then the court's rulings are subject to the more deferential plain-error standard of review." *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012).

A

Owen first objects to the admission of his $7 million tax judgment and agreed order requiring him to report new business involvement to the IRS. He argues that the district court should have excluded that evidence under either Federal Rule of Evidence 404(b) or Rule 403. Neither argument succeeds.

Rule 404(b) generally prohibits the admission of evidence of any "crime, wrong, or act" if proffered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But relevant here, background or *res gestae* evidence falls outside the ordinary Rule 404(b) analysis. *See United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013). That category covers "other acts that are inextricably intertwined with the charged offense," so long as there is sufficient "'temporal proximity, causal relationship, or spatial connection[]' among the other acts and the charged offense." *Id.* (citation omitted). Qualifying for admission includes evidence that "is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.* (citation omitted).

The district court did not abuse its discretion under Rule 404 by admitting Owen's tax judgment and agreed order as *res gestae* evidence. This evidence had sufficient "temporal proximity" for admission because Owen's obligations under the tax judgment "were still pending at the time of" Owen's charged conduct. *United States v. Donohue*, 726 F. App'x 333, 344 (6th

Cir. 2018) (citation omitted). Those materials also were "inextricably intertwined" with the charged offenses: The evidence helped the jury understand Owen's bait-and-switch use of Kimberly to apply for the loans. *Adams*, 722 F.3d at 810. The evidence thus was "necessary to telling a cogent story" about Owen's fraudulent schemes. *Gibbs*, 797 F.3d at 424.

Nor did the district court commit a Rule 403 error. The balancing test of Rule 403 "is strongly weighted toward admission." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018). Relevant evidence is subject to exclusion only when "its probative value is *substantially outweighed* by a danger of unfair prejudice." *United States v. Baskerville*, 164 F.4th 459, 491 (6th Cir. 2026) (emphasis in original) (citation modified). The district court acknowledged that Owen's tax judgment, while not a felony conviction, "is for such a high amount that it is [] likely to produce prejudice." Order re: Mot. in Limine, R.135, PageID 1269. Even so, the court deemed the judgment "highly probative" because "[w]ithout knowing about his inability to secure financing, his involvement in the fraudulent loan scheme appears attenuated at best." *Id.* The district court also found that the "probative value [was] further increased because Owen was under the IRS reporting obligation at the time of the fraudulent loan applications." *Id.* The district court thus reasoned that Owen's outstanding tax judgment was not substantially more prejudicial than probative because it was critical to understanding why Owen and Kimberly structured the loan applications as they did. Owen fails to explain why that conclusion rested "on the wrong legal standard, a misapplication of the correct standard, or on clearly erroneous facts." *Gibbs*, 797 F.3d at 422. So the district court did not abuse its "broad discretion in balancing probative value against potential prejudicial impact." *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004).

B

Owen's second evidentiary challenge concerns the testimony of two attorneys regarding the DCR debt and litigation: Matthew Nygaard, a recoupment counsel for Fidelity National Financial (Commonwealth's parent company), and Elliot Miller, the attorney who took Owen's 2014 deposition relating to the collection effort on the DCR judgment. Owen contends that both witnesses stated impermissible legal conclusions. Because Owen did not present these objections below, we review only for plain error. *Nixon*, 694 F.3d at 628.

Boiled down, the testimony at issue explained how title insurance and subrogation work and further established that Commonwealth exercised its subrogation right to pursue DCR's $80,000 claim against Owen. That testimony did not render an inappropriate legal conclusion. The only "legal" concept at issue in the testimony is subrogation. But as used by the witnesses, the concept of subrogation does not have "a separate, distinct and specialized meaning in the law" that is "different from that present in the vernacular." *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985). *Compare*, *Subrogation*, Black's Law Dictionary 1732 (12th ed. 2024) ("The substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor."), *with*, *Subrogation*, American Heritage Dictionary of the English Language 1737 (5th ed. 2011) ("The substitution of one person or entity for another, especially when the substituted party becomes responsible for a debt or legal claim."). So Nygaard's and Miller's testimony did not impermissibly resolve open legal questions. Nor did it invade the province of the jury. In discussing subrogation, Nygaard and Miller did not opine about the elements of the crimes alleged or provide an opinion about Owen's ultimate guilt or innocence. *Cf. Torres*, 758 F.2d at 151. Instead, they informed the jury of a background fact about the DCR-Commonwealth contract and how those parties' relationship affected

Commonwealth's conduct vis-à-vis Owen. The district court thus did not plainly err in permitting Nygaard and Miller to testify regarding the steps that Commonwealth took in paying DCR and attempting to recover from Owen.

IV

Owen's next category of objections concerns the jury instructions. Owen did not object to the jury instructions at trial, so we review them for plain error. *United States v. Harvey*, 653 F.3d 388, 395 (6th Cir. 2011). That means we will reverse only if, "taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *Howard*, 947 F.3d at 945 (citation omitted). Owen has not made that showing.

A

For the first time on appeal, Owen contends that the jury instructions for Counts 1, 2, 3, and 4 violated the Double Jeopardy Clause. He claims that is so because "nothing in the instructions for Counts 1, 2, 3, or 4 informed the jury which factual offenses the counts were tied to." Owen Br. 46. From there, Owen contends that the instructions permitted the jury to convict him more than once for the same crime.

Double jeopardy principles apply in multi-count prosecutions. Where, as here, "prosecutors seek multiple charges against a defendant, they must link those multiple charges to multiple identifiable offenses." *Valentine v. Konteh*, 395 F.3d 626, 636 (6th Cir. 2005). That is because "undifferentiated counts introduce[] the very real possibility that [a defendant] would be subject to double jeopardy . . . by being punished multiple times for what may have been the same offense." *Id.* at 634-35. "[D]ifferentiation," though, "does not require overly-burdensome precision." *Id.* at 637. To pass double-jeopardy muster, "the record" must "show[] with accuracy to what extent [a defendant] may plead a former acquittal or conviction" in future proceedings

against him for a similar offense. *Russell v. United States*, 369 U.S. 749, 764 (1962) (citation modified). Both "the indictment" and "the jury instructions" can "inform[] the jury which factual incidents were connected to which charges." *Valentine*, 395 F.3d at 636.

The record confirms that the Government adequately differentiated the factual predicates for each of Owen's challenged counts. Start with the indictment, which described two different schemes. Counts 1 and 2 alleged that Owen and Kimberly devised a scheme to *obtain* loan funds from three different banks by means of material falsehoods during the loan application and disbursement process. Counts 3 and 4, on the other hand, alleged that Owen and Kimberly devised a scheme to fraudulently interfere with Eclipse's attempts to *recover* the outstanding funds owed to it.

The Government's proof and arguments at trial likewise emphasized the difference between the loan-application scheme alleged in Counts 1 and 2 and the collection-evasion scheme alleged in Counts 3 and 4. From opening to closing statements, and through testimony, the Government delineated the schemes' distinct timing, victims, fraudulent object, and misrepresentations.

Viewed in the context of the Government's charges and the trial proceedings—which repeatedly distinguished between the loan-application scheme and collection-evasion scheme— the jury instructions also sufficiently distinguished the challenged counts. The district court explained that Count 1 charged Owen with conspiracy to commit bank fraud against CUB, Eclipse, and AFB, and that the scheme was "to obtain money and funds" from those institutions. Trial Tr. Vol. 7, R.227, PageID 3441. The court explained that Count 2 charged Owen with defrauding those three institutions. By contrast, the instructions for Counts 3 and 4 focused on Owen's conduct with respect to Eclipse Bank only. The district court instructed the jury that the relevant

scheme for those counts was "to deceive or cheat Eclipse Bank and to deprive it of something of value." *Id.* at PageID 3450.

In short, the trial record enables us to discern "what double jeopardy would prohibit" by differentiating, for each count, which "factual incidents were presented and decided by this jury." *Valentine*, 395 F.3d at 635. Because the at-issue counts were sufficiently differentiated, there was no double-jeopardy error in the district court's instructions. At a minimum, Owen fails to cite any case establishing that the district court's instructions "clearly" ran afoul of the Double Jeopardy Clause, as is his burden. *Howard*, 947 F.3d at 945 (citation omitted). That is fatal to his plain-error challenge. *See Clay*, 162 F.4th at 769.

B

Owen also objects to the jury instructions for Counts 7 and 8. When instructing the jury on the elements of wire fraud, the district court stated: "And fourth, that the defendant used wire communications in interstate commerce in furtherance of the scheme. The government and the defendant have agreed or stipulated to this fact, therefore, you must accept the fact as proved." Trial Tr. Vol. 7, R.227, PageID 3454, 3456. We reject Owen's two challenges to this language.

*First*, Owen argues that the instruction wrongly directed a finding of guilt. Our plain-error review forecloses that argument, too, as we have approved materially identical instructions on plain-error review. *See United States v. Jones*, 108 F.3d 668, 670-73 (6th Cir. 1997) (en banc); *see also United States v. Vaughn*, 12 F. App'x 188, 192 (6th Cir. 2000). As in those cases, Owen cites no precedent of this Court that prohibited the district court from instructing that a stipulated fact had been proven—let alone a case that made any error "clear" or "obvious." *Jones*, 108 F.3d at 672 (citation omitted).

*Second*, Owen objects that the instruction implied that the parties stipulated that the act "was in furtherance of the scheme." Owen Br. 50-51. But even if the district court's language could have been clearer, the instruction did not result in a "miscarriage of justice." *Jones*, 108 F.3d at 673. The jury heard the exact language of Owen's stipulation both during the trial and during the jury instructions; so it knew exactly which facts had been stipulated. And there was overwhelming evidence that the deposits at issue were in furtherance of the scheme to defraud in any event. Without prejudice, Owen cannot establish entitlement to instruction-based reversal. *See id.*

V

Owen last objects to six aspects of the district court's Guidelines calculation. We address each argument in turn and, ultimately, affirm Owen's sentence.

A

To begin, Owen asserts that the district court improperly increased his offense level by overestimating the loss amount from his fraud offenses. Under the U.S. Sentencing Guidelines § 2B1.1(b)(1), the offense level of a person convicted of fraud increases incrementally based on the amount of loss caused. *See* U.S.S.G. § 2B1.1(b)(1). The 2023 Guidelines commentary defined "loss" as "the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n.3. "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." *Id.* Because the loss amount is a fact question that district courts "are well positioned to assess," we review the district court's calculation only for clear error. *United States v. You*, 74 F.4th 378, 398 (6th Cir. 2023).

The district court found the loss amount in Owen's case to be $416,917.52; that amount resulted in an offense-level increase of 12. The district court's total included $181,049.05 in

unpaid principal on the Eclipse loans, $155,868.47 in Eclipse's attorneys' fees in post-default litigation, and $80,000 from the value of the DCR judgment. Owen argues that the district court's calculation of the total loss amount was wrong for three reasons. None warrants reversal.

*First*, Owen asserts that the outstanding balance of the Eclipse loans should not have been included in the loss calculation because his conduct did not cause those losses. Instead, he claims that "[t]enant business problems, vandalism, and foreclosure sales of properties for less than appraised values" were the real causes of Eclipse's net-negative balance, Owen Br. 54, and that "[t]he omissions from the financial statements had nothing to do with the loss ultimately suffered," *id.* at 56. But the trial evidence demonstrated that Eclipse would not have issued the loans but for Owen's effort to mask his and Kimberly's true financial state through misrepresentations and fraudulent omissions. We agree with the district court that causation for Eclipse's loss was "clear" in this case. Sent'g Tr. Vol. 2, R.234, PageID 3830.

*Second*, Owen argues that the district court should not have counted the value of the DCR judgment because DCR itself suffered no actual loss. This argument amounts to a repackaged version of Owen's collateral attack on Commonwealth's right to enforce the DCR judgment, and we reject it for the same reasons given above. Regardless of which party was proper to pursue that debt in litigation (DCR or Commonwealth), it is undisputed that the DCR judgment was "valid" at the time of Owen's charged conduct and that Owen owed $80,000 pursuant to that judgment for the defaulted loan. *Id.* at PageID 3832. The district court did not err in concluding that the value of the DCR judgment was part of the reasonably foreseeable pecuniary harm resulting from Owen's fraud.

*Third*, Owen argues that the district court erred by including Eclipse's attorneys' fees in the loss calculation. But even without these fees, Eclipse's direct loss of $181,049.05 plus the

$80,000 DCR judgment adds up to $261,049.05. That amount still brings Owen within the Guidelines range of between $250,000 and $550,000 and would produce the same 12-level enhancement. U.S.S.G. § 2B1.1(b)(1). So any asserted attorneys'-fees error is harmless. *See United States v. Johnson*, 79 F.4th 684, 706 (6th Cir. 2023).

B

Owen next contests the district court's application of a two-level increase to his offense level because the offense involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." U.S.S.G. § 2B1.1(b)(9)(B). That argument fails given the extensive trial evidence showing "that the information on the face of the bankruptcy documents" Owen submitted "was false." Sent'g Tr. Vol. 3, R.235, PageID 3917. Among other things, testimony established that the address listed on the bankruptcy petition for the Wintersteen company was false, that no debt was owed to the Wintersteen Brothers, and that the petition's false statements were "designed to get Mr. Owen paid" before other creditors. *Id.* at PageID 3918. We therefore affirm application of the enhancement under § 2B1.1(b)(9)(B).

C

The district court also imposed a two-level enhancement under § 2B1.1(b)(17)(A) because Owen "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense[.]" U.S.S.G. § 2B1.1(b)(17)(A). Owen does not dispute that the proceeds of his fraud went to CD Management of Shelbyville or CD Management, LLC. Nor does he dispute that these entities were under his control and obtained over $1,000,000 in gross receipts from the relevant financial institutions. Instead, Owen asserts that he can sidestep the enhancement because the funds were not disbursed to him individually.

We review the district court's interpretation of the term "derived" within § 2B1.1(b)(17)(A) de novo. *See, e.g.*, *United States v. Green*, 167 F.4th 832, 864 (6th Cir. 2026). It appears that our Court has not yet squarely considered whether an individual defendant can "derive[]" gross receipts under § 2B1.1(b)(17)(A) through an entity the defendant controls. *Cf. United States v. Ross*, 132 F.4th 952, 956-62 (6th Cir. 2025) (concluding that the enhancement applies where the defendant obtained funds through bank-financed transaction between entity he managed and third-party real-estate firm). But some of our sister circuits have—and have concluded that an individual can derive funds by indirectly obtaining them through an entity using criminal conduct. *See United States v. Edelkind*, 467 F.3d 791, 800-01 (1st Cir. 2006) (collecting cases); *United States v. Stolee*, 172 F.3d 630, 631 (8th Cir. 1999) (per curiam). The First Circuit, for example, has acknowledged that the enhancement applies where "wrongfully obtained funds went to a company controlled by the defendant even though the funds were held in the corporation's name." *Edelkind*, 467 F.3d at 800. We agree with that interpretation.

For starters, it aligns with the ordinary meaning of "derive," as "[t]o obtain or receive from a source." *Derive*, American Heritage Dictionary of the English Language 489 (5th ed. 2011). A defendant who controls and makes use of an entity's ill-gotten funds has "obtain[ed]" those funds no less than if the funds went to his individual account. The Guidelines commentary confirms that plain-text reading by defining "[g]ross receipts from the offense" to include "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2B1.1 cmt. n.13(B). Our related criminal-forfeiture cases, moreover, have applied a similar rule. *See United States v. Parenteau*, 647 F. App'x 593, 597 (6th Cir. 2016). In *Parenteau*, we found that an entity was legally indistinguishable from its criminal-defendant owner for the purposes of criminal forfeiture because the defendant "owned and exercised total control over" the

entity, the defendant diverted funds from the entity for personal use, and the defendant used the entity to "commit, facilitate, and disguise or conceal" financial crimes. *Id.* at 596-98.

The relevant interpretive sources therefore indicate that an individual can "derive" funds by indirectly obtaining them through his criminal conduct. That covers the scenario here, where Owen fraudulently caused entities that he controlled to obtain loans for his benefit.

D

Next, the district court imposed a two-level enhancement under U.S.S.G. § 3B1.1(c) because Owen was "an organizer, leader, manager, or supervisor" in the money-laundering activity. Sent'g Tr. Vol. 3, R.235, PageID 3924. "We review a district court's decision to grant a leadership enhancement under § 3B1.1 deferentially because it raises a fact-intensive question." *United States v. Minter*, 80 F.4th 753, 758 (6th Cir. 2023) (citation modified).

Owen argues that the district court erred because there was no one for him to lead. On his account, "[t]here was an absence of evidence that [Kimberly] participated in the money laundering in Count 10." Owen Br. 61. But as the district court stated during the sentencing hearing, "there's no question" that Owen "wrote out lots of checks," including "ones [Kimberly] signed." Sent'g Tr. Vol. 3, R.235, PageID 3925. And the record developed at trial fully supported a finding that Kimberly was a participant in the concealment money laundering at issue in Count 10, even though she was not charged as a conspirator. The evidence showed that the couple garnished Kimberly's wages using the judgment that Kimberly obtained against herself on behalf of CD Management, LLC, that the garnishment checks were deposited into an account belonging to CD Management of Shelbyville, and that both wrote checks out of the CD Management of Shelbyville account for deposit into an account belonging to Kim Owen, DMD, for personal use. The application of the leadership enhancement was therefore proper.

E

The district court found that Owen had a criminal-history score of two, based in part on a 2013 Bullitt County, Kentucky, misdemeanor conviction. Owen argues that this Bullitt County conviction should not have counted toward his criminal-history score because it was expunged. We review the interpretation of the Guidelines provisions that govern Owen's criminal-history score de novo. *United States v. Sexton*, 894 F.3d 787, 793 (6th Cir. 2018).

The Guidelines generally provide for criminal-history points to be added "for each prior sentence," U.S.S.G. § 4A1.1, meaning "any sentence previously imposed upon adjudication of guilt," *id.* § 4A1.2(a)(1). But "[s]entences for expunged convictions are not counted" when calculating a defendant's criminal-history score. *Id.* § 4A1.2(j). The Guidelines commentary, however, clarifies that sentences resulting from convictions that are "set aside . . . for reasons unrelated to innocence or errors of law . . . are to be counted" in the criminal-history calculation. *Id.* § 4A1.2 cmt. n.10. Consistent with that commentary, we have previously held that "a conviction is considered 'expunged' within the meaning of § 4A1.2(j) only if 'the adjudication of guilt itself was vacated because of demonstrable innocence or legal error.'" *United States v. Sturgill*, 761 F. App'x 578, 582 (6th Cir. 2019) (quoting *United States v. Shor*, 549 F.3d 1075, 1078 (6th Cir 2008)); *see also United States v. De Leon*, 810 F. App'x 384, 386 (6th Cir. 2020).

Here, there is no dispute regarding the existence of the Bullitt County conviction. And Owen did not present any evidence that the conviction was expunged due to innocence or legal error. *See Sturgill*, 761 F. App'x at 582 (noting that defendant has the "burden to show that the convictions could not be used to determine [his] criminal history score"). Because Owen did not show that his conviction was expunged "because of demonstrable innocence or legal error," the

district court did not err in counting the conviction toward his criminal-history score under this Court's existing case law. *Shor*, 549 F.3d at 1078 (footnote omitted).

Owen acknowledges our precedents adopting the narrower interpretation of "expunged." Owen Reply 31. But he counters that, in light of *United States v. Gomez*, 129 F.4th 954 (6th Cir. 2025), we should now adopt a plain-text reading of "expunge" that requires excluding his Bullitt County conviction from the criminal-history score. Owen's argument, though, does not address *United States v. Prather*, 138 F.4th 963, 974-75 (6th Cir.), *petition for cert. filed*, No. 25-7160 (Jul. 22, 2025), which came after *Gomez* and directs that this Court must continue to apply *Auer* deference to the Guidelines commentary. *See also You*, 74 F.4th at 397. Nor does he seek to apply the governing *Kisor* framework. *See Prather*, 138 F.4th at 974. So whatever the appeal of Owen's argument as an original matter, he has forfeited any argument against applying *Prather* or our precedent interpreting "expunge" for § 4A1.2(j) purposes.

F

Finally, the district court applied a two-level enhancement under U.S.S.G. § 3C1.1 because it found that Owen "willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the money laundering offense[,] and [] the obstructive conduct related to [that offense]." Sent'g Tr. Vol. 3, R.235, PageID 3926. The basis for the district court's enhancement was its finding that Owen gave inconsistent statements—one in a civil deposition, the other at trial—about the origins of a 2009 promissory note. At sentencing, the district court quoted Owen's inconsistent statements about the 2009 promissory note but repeatedly stated that it did not "need to determine which [statement] is actually true[.]" *Id.* at PageID 3927. The district court then concluded that "the fact of the matter is that there was an obstruction here." *Id.* at PageID 3928

"To impose an obstruction-of-justice sentencing enhancement, the district court must 'make independent findings necessary to establish a willful impediment to, or obstruction of, justice.'" *United States v. Jackson*, 154 F.4th 422, 429 (6th Cir. 2025) (quoting *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)). Owen argues that the district court did not "properly make a finding of obstruction." Owen Br. 63. And Owen may have a point: The district court did not "specify the perjured testimony and make factual findings as to the testimony's falsity, willfulness, and materiality." *Jackson*, 154 F.4th at 427.

But even assuming that the district court's obstruction analysis was insufficient, vacatur of the sentence does not automatically follow. Rather, under the doctrine of harmless error, we may uphold a sentence notwithstanding a Guidelines-calculation error if "the district court thought the sentence it chose was appropriate irrespective of the Guidelines range." *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016); *see also United States v. Morrison*, 852 F.3d 488, 491-92 (6th Cir. 2017). Here, the district court made such a finding: It stated that "regardless of the guideline range produced, the court would have sentenced the same when considering all of the factors set forth in 3553(a)(2)" in light of "the information provided at trial and all the evidence submitted to the court[.]" Sent'g Tr. Vol. 3, R.235, PageID 3957.

That statement by the district court about the appropriate sentence reflected its view that multiple aspects of the Guidelines calculation were, if anything, too lenient. The district court additionally stated, for instance, that the "the losses here aren't as high as they certainly could have been," and "compared to all of the various things that were done," the "loss number actually feels low under the circumstances[.]" *Id.* at PageID 3950-51. The district court also expressed "serious concern" that Owen had not "learned [his] lesson," in part because there "remain[ed] an incredible lack of candor to the court." *Id.* at PageID 3951-52. Indeed, the district court remarked that it did

not think that Owen's Guidelines range "fully takes into account what happened in this case" given "the amount of deception and fraud and continuation of that." *Id.* at PageID 3954.

It is therefore clear from the record that removing the obstruction enhancement would not have altered Owen's ultimate sentence. So to the extent the inclusion of the enhancement resulted in an incorrect Guidelines range, any error in the district court's calculation was harmless.[4] We therefore affirm Owen's sentence of 136 months' imprisonment.

*     *     *

For the foregoing reasons, we affirm Owen's conviction and sentence.

---

[4] In a footnote, Owen also asserts that "[c]umulative errors require reversal." Owen Br. 64 n.11. But that perfunctory statement falls short of the requisite cumulative-error showing "that the combined effect of individually harmless errors was so prejudicial as to render [Owen's] trial fundamentally unfair." *United States v. Underwood*, 859 F.3d 386, 395 (6th Cir. 2017) (citation omitted). So we reject Owen's plea for reversal on that basis.